The UNITED STATES, Appellant,

v.

The CITIZENS & SOUTHERN NATIONAL BANK, Appellee,

and

the Riggs National Bank, Intervenor.

No. 89–1361.

United States Court of Appeals, Federal Circuit.

Nov. 14, 1989.

---

(R2:151).

Tamra S. Phipps, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for appellant. With her on the brief were Stuart E. Schiffer, Acting Asst. Atty. Gen., David M. Cohen, Director and Helene M. Goldberg, Asst. Director. Also on the brief were Edith E. Holiday, General Counsel, Mary Ann Gadziala, Asst. General Counsel, John E. Brown, Deputy Asst. Gen. Counsel, David A. Ingold, Chief Counsel, Edward C. Gronseth, Atty. and Ingrid D. Falanga, Atty., Financial Mgmt. Service, U.S. Treasury, Washington, D.C., of counsel.

Clifton Elgarten, Crowell & Moring, Washington, D.C., for intervenor The Riggs Nat. Bank of Washington, D.C.

Before FRIEDMAN, Senior Circuit Judge,* BISSELL and MAYER, Circuit Judges.

## OPINION

MAYER, Circuit Judge.

The United States appeals the decision of the General Services Board of Contract Appeals holding invalid because not conducted pursuant to the Brooks Act, 40 U.S.C. § 759 (1982 & Supp. V 1987), the Department of Treasury Financial Management Service's (FMS) selection of The Riggs National Bank to serve as a "Lead Concentrator Bank" in FMS's proposed new cash concentration and reporting system, "U.S. CA$H–LINK". *Citizens & S. Nat'l Bank,* GSBCA No. 9721–P, 89–1 B.C.A. (CCH) ¶ 21,354, 1988 WL 125814 (Nov. 23, 1988). We reverse.

### Background

By an April 14, 1988 request for proposal (RFP), FMS invited financial institutions eligible to act as financial agents for the government to submit proposals for the development and implementation of a new system of cash concentration and deposit reporting, dubbed "U.S. CA$H–LINK". The system would replace and improve upon seven existing smaller systems that performed similar functions and that, together, accounted for some $387 billion in Treasury receipts. Essentially, the systems make possible the concentration of monies owed the government originally collected at thousands of different locations, as well as the compilation and distribution of the detailed records of these manifold transactions.

As the arm of Treasury responsible for developing and overseeing these concentration and reporting functions, FMS determined, based on information received from the commercial banking industry pursuant to a January 1987 request for information, that the adoption of new electronic technology could appreciably improve the efficiency of the existing concentration systems when combined in CA$H–LINK. To that end, FMS issued the RFP to commercial financial institutions that either were then, as in the case of both Riggs and Citizens & Southern, or were eligible to be, designated as both "depositaries" and "financial agents" of the federal government under sections 90 and 265 of the National Bank Act, 12 U.S.C. §§ 90, 265 (1988). For the RFP, FMS decided to follow the bidding procedure it had used previously in selecting financial institutions to run the existing

---

* Judge Friedman took senior status on November 1, 1989.

concentration systems. Citizens & Southern had itself been selected as a lead concentrator bank for the Treasury General Account Cash Concentration System via this procedure, a competitive one loosely modeled on the Federal Acquisition Regulations (FAR).

More than twenty financial institutions submitted proposals for CA$H–LINK. Riggs' proposal was selected but Citizens & Southern petitioned the Board to set the award aside because it was not conducted in accordance with the FAR. Treasury responded that the Board had no jurisdiction because the transaction was not a procurement of automated data processing equipment (ADPE) within the meaning of the Brooks Act. The Board ruled it had jurisdiction under section 111(f) of the Brooks Act, 40 U.S.C. § 759(f) (1982 & Supp. V 1987), to entertain Citizens & Southern's protest but reserved judgment on the merits of the claims pending further hearing. *Citizens & S. Nat'l Bank*, GSBCA No. 9721–P, 89–1 B.C.A. (CCH) ¶ 21,278, 1988 WL 116944 (Oct. 28, 1988). Thereafter, it denied the protest but reaffirmed its decision that the RFP was a procurement of ADPE within the meaning of the Brooks Act and that Treasury must appoint a contracting officer, *see* 48 C.F.R. § 1.601 (1988), and receive a delegation of authority from the Administrator of the General Services Administration, *see* 40 U.S.C. § 759(b)(2) (1982 & Supp. V 1987), before proceeding further. The government appeals.

### Discussion

Since Congress passed the National Bank Act, ch. 106, 13 Stat. 99 (1864) (codified as amended in scattered sections of 12 U.S.C.), Treasury has had the authority to designate national banks as depositaries and employ them as financial agents of the government. Congress thereby recognized for the first time what is taken for granted today: it is more efficient for Treasury to act through national banks like Riggs and Citizens & Southern in fulfilling its statutory mandate of managing the nation's money than it is for the federal government alone to develop and maintain a banking system for this purpose. When commercial national banks act under the agreements that necessarily embody this congressionally sanctioned relationship, they do so as *"special agent*[s] for the particular purpose required." *Branch v. United States*, 12 Ct.Cl. 281, 287 (1876), *aff'd*, 100 U.S. 673, 25 L.Ed. 759 (1880) (emphasis added). Public money the banks receive in this capacity, "when under the control of the Treasurer of the United States and subject to his draft, may, to that extent and in some sense, be regarded as in the public Treasury...." *Id.* at 289.

Therefore, Treasury's designation of banks as depositaries and financial agents pursuant to sections 90 and 265 of the National Bank Act does not constitute a "procurement" of property and services within the meaning of the Federal Property and Administrative Services Act of 1949, 40 U.S.C. §§ 471–544 (1982), as amended by the Brooks Act, 40 U.S.C. § 759 (1982 & Supp. V 1987). In this day and age, commercial banks must employ ADPE to be of value to Treasury as financial agents. But that does not change the character of the relationship: the government as principal and in its sovereign capacity delegates to its financial agents some of the sovereign functions that the government itself would otherwise perform. The relationship is governed by the National Bank Act and attendant Treasury regulations. The body of procurement law which includes the Property and Brooks Acts, by contrast, applies to Treasury only when it is acting as a commercial purchaser of goods and services. *Cf. Kania v. United States*, 650 F.2d 264, 268, 227 Ct.Cl. 458 (1981).

■ From the start of this case the Board assumed this was a procurement contract. But that was the question. The Brooks Act gives the Administrator of the General Services Administration the authority to coordinate and regulate the "purchase, lease, and maintenance" of ADPE by federal agencies. 40 U.S.C. § 759(a)(1) (1982 & Supp. V 1987). This comprehends contracts that require "the performance of a service or the furnishing of a product which is performed or produced making

significant use of [ADPE]." *Id.* § 759(a)(2)(A). Because the Board apparently focused only on the ADPE requirements of the RFP, it thought that FMS was purchasing "significantly, if not entirely, ADPE". It summarily rejected FMS's argument that the transaction was not a procurement at all but the designation of a depositary and financial agent pursuant to the National Bank Act. In this, it erred.

Of course, Treasury specified in some detail the level and type of service it desired from the new CA$H–LINK system. For instance, it set out which divisions of Treasury and which other federal agencies and participating financial institutions were to have access to the system, as well as what type of data were to be produced and in what form. But the RFP largely left to the financial institutions how to provide the required services. Subject to the constraints that the new system interface with other existing Treasury cash management systems not being subsumed in CA$H–LINK and that FMS divisions have access to CA$H–LINK, it is apparent that those submitting proposals were free and even encouraged to use whatever ADPE would allow them to perform the desired services most efficiently.

Under the terms of the CA$H–LINK agreement, FMS would not receive title to either the computer hardware or software necessary to run the system. The hardware was operated by and remained the property of the financial institution; FMS secured only "restricted rights" to use the software as necessary to access the data bases of the system. Indeed, Riggs was free under CA$H–LINK to do what Citizens & Southern previously had done when administering the Treasury General Account Cash Concentration System: subcontract the bulk of the data processing to a third party. Any data bases and output formats developed under the program would become the property of FMS only in the event CA$H–LINK were terminated or otherwise expired.

■ What Treasury did here was designate or authorize, in the exercise of its discretion, a financial institution to act in its stead for the stated purposes. Regardless of appearances, this was akin to appointment of public employees, which is not a matter of contract even when terms and conditions guide the employment relationship. *Zucker v. United States,* 758 F.2d 637, 640 (Fed.Cir.1985); *Kania,* 650 F.2d at 268; *see Army & Air Force Exchange Serv. v. Sheehan,* 456 U.S. 728, 738–41, 102 S.Ct. 2118, 2124–26, 72 L.Ed.2d 520 (1982). Just as public employment results from the conferral of a status, so does Riggs' financial agency: Treasury conferred a status on Riggs, whose undertaking was set out in return. This was not a procurement contract and the Board had no jurisdiction to entertain Citizens & Southern's protest.

### Conclusion

Accordingly, the decision of the Board that it has jurisdiction over this protest under the Brooks Act is reversed and the case is remanded with instructions that it be dismissed.

### COSTS

No costs.

REVERSED AND REMANDED