**TRANSACTIVE CORPORATION, Appellant,**

v.

**UNITED STATES of America and Robert E. Rubin, Secretary of Treasury, Appellees.**

**No. 95–5312.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 15, 1996.

Decided Aug. 13, 1996.

Kathleen L. Beggs, Washington, DC, argued the cause for appellant, with whom David Povich, Angela S. Kim and Michael R. Pompeo were on the briefs.

Darya Geetter, Assistant United States Attorney, Washington, DC, argued the cause for appellees, with whom Eric H. Holder, Jr., United States Attorney, R. Craig Lawrence and Edith S. Marshall, Assistant United States Attorneys, David A. Ingold and Ingrid D. Falanga, Counsels, United States Department of Treasury, were on the brief.

Herschel C. Minnis, Assistant General Counsel, Florida Department of Health and Rehabilitative Services, Tallahassee, FL, and Charles A. Miller and Caroline M. Brown, Washington, DC, attorneys for the Alabama Department of Human Resources, Arkansas Department of Human Services, Georgia Department of Human Resources, Kentucky Department for Social Insurance, Missouri Department of Social Services, North Carolina Department of Human Resources, and Tennessee Department of Finance and Administration, were on the brief for amicus curiae the Southern Alliance of States.

Before: SENTELLE, RANDOLPH, and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

Transactive Corporation ("Transactive") appeals the District Court's grant of summary judgment against it. Transactive had sued to enjoin the decision of the Department of Treasury ("Treasury") to select the private administrator of a proposed Electronic Benefits Transfer ("EBT") system that would cover most of the southeastern United States through a process that would have inherently excluded Transactive. At issue is whether Treasury properly decided to use an Invitation for Expressions of Interest ("IEI") process instead of a more typical (and lengthy) bidding process governed by the

Competition in Contracting Act ("CICA") to choose its EBT administrator. Because we conclude that Treasury based its decision to use an IEI on its mistaken belief that only a financial agent of the federal government could legally fulfill the specifications of its EBT design, we reverse the decision of the District Court and direct it to remand this matter to Treasury for further proceedings not inconsistent with this decision.

## BACKGROUND

Electronic Benefits Transfer is the latest in a series of efforts by federal and state governments to reduce administrative costs and inefficiencies associated with the redistribution of public funds to specific individuals. In general, EBT envisions at least two separate transfers. The first transfer sends benefit payments from funds held by Treasury into an account of an individual recipient via what is called the Automated Clearing House ("ACH") method. The second transfer occurs when the recipient withdraws funds from this account through use of a debit card, which is similar to an Automated Teller Machine ("ATM") card. EBT thus promises the efficiencies of a direct deposit system and the conveniences of a debit card.

In November 1993, after having performed two small-scale tests of a federal EBT system, the Office of Management and Budget established a federal task force, including representatives from the Departments of Agriculture, Health and Human Services, Education, and Treasury, to prepare a significantly larger test of EBT. Treasury already had in place significant regulations regarding Electronic Fund Transfers ("EFT") through the ACH method, see 31 C.F.R. Pt. 210, a category that includes direct deposit, which is the type of EFT geared towards individuals who already possess electronically-accessible accounts. Three months after the task force was created, Treasury added additional regulations further discussing EFT disbursement as part of a section of regulations addressing federal disbursement in general. See 31 C.F.R. Pt. 206.

On April 5, 1994, eight states (collectively, the Southern Alliance of States or "SAS") agreed to join Treasury and the federal task force in designing and implementing a joint EBT model throughout their jurisdictions.[1] This cooperative venture developed an EBT proposal that permits both federal and participating state governments to transfer electronically public-assistance payments, including those from Aid to Families with Dependent Children and food stamps, as well as various other programs, to their recipients, and then to allow these recipients to access their benefits at compatible ATMs or "point-of-sale" ("POS") readers, such as ones commonly found at grocery stores or gas stations. In order to encompass individuals who could not otherwise take advantage of direct deposit or other existing forms of EFT, the EBT proposal was limited to individuals who did not already have an electronically accessible account of their own.

The EBT program did not envision much governmental participation, by Treasury or any other federal department, in its actual operation. Instead, Treasury would limit its role largely to encouraging recipients of federal benefits in the test area to participate in the program. Treasury would also be responsible for contracting with some private party to perform the variety of tasks necessary to the federal elements of the program. Of these tasks, three are particularly relevant to this litigation. First, in part because the federal government concluded that it could not require benefit recipients to use either direct deposit (if a recipient already had an electronically-accessible account) or EBT (if he did not) without some more explicit statutory mandate, the party who won the EBT contract would bear some responsibility to market the program. Second, because the purpose of the EBT program was to extend direct-deposit type service to persons without an electronically-accessible account, the EBT contractor would have to be able to obtain or establish such accounts for these individuals. Third, because the model

---

1. The number of states participating in SAS has varied. According to its final *amicus* brief before this court, eight states—Alabama, Arkansas, Florida, Georgia, Kentucky, Missouri, North Carolina, and Tennessee—are now represented in this litigation. Seven states were "charter" members of the group, and the district court stated that nine states (apparently including Mississippi) were part of SAS at the time of its decision.

was intended to be an "open" system—that is, a system that would allow recipients to access their funds from most ATMs rather than from only EBT-specific ATMs—and because it involved Treasury sending payments using its established ACH method, the private party who received the EBT contract would have to arrange for the EBT accounts to be connected with the ACH network. In addition to these tasks, of course, this contractor would have to perform the many other services basic to an EBT program, including providing debit cards to EBT recipients and informing EBT recipients how those cards may be used.

On March 9, 1995, Treasury published an IEI in order to solicit bids from parties wanting to manage the proposed EBT program. Used by Treasury in selecting a contractor for its two small-scale EBT tests, an IEI is a method of solicitation for banking services that emerges from the authority of Treasury to name certain financial institutions as "depositaries of public money" and "financial agents" of the federal government. *See, e.g.,* 12 U.S.C. §§ 90, 265; *see also* 31 C.F.R. Pt. 202 (outlining the criteria governing "the designation of Depositaries and Financial Agents of the Government"). No statutory provision, however, clearly establishes when Treasury may choose to use an IEI to obtain financial services instead of relying on the procurement procedures of the CICA, 41 U.S.C. § 251 *et seq.,* further described in the Federal Acquisition Regulations ("FAR"), 48 C.F.R. § 1.000 *et seq.*

The IEI procedure differs in several respects from the CICA bidding process. The most critical to this litigation is that a bid process pursuant to CICA may select any qualified vendor, but an IEI may select only a financial institution. In other words, by using the IEI procedure in this case, Treasury foreclosed any possibility that parties who were not connected to some financial institution could win the EBT contract.

Transactive, a private entity, objected to Treasury's decision to use an IEI. Transactive had already had several years of experience as an EBT provider, albeit in a "closed," or stand-alone, system, which, unlike the "open" system specified for the fed-eral-state model, only permits EBT recipients to access their accounts at EBT-specific terminals, and thus does not require the system be linked to the ACH network or to an established financial institution. In fact, Transactive was and is not associated with any financial institution. Treasury's decision to use an IEI thus excluded Transactive from seeking the EBT contract.

On March 29, 1995, Transactive sued to enjoin use of the IEI. Transactive contended that Treasury could not procure the services necessary for its proposed EBT system through an IEI. Treasury countered that its search for a private party to perform EBT services was not a general commercial procurement, but rather an appropriate use of Treasury's power to appoint financial agents who may hold and disburse federal funds and perform other auxiliary banking services for the government. The two parties disputed whether Treasury acted contrary to various restraints on its authority to use an IEI, including segments of the National Bank Act, *see, e.g.,* 12 U.S.C. §§ 90, 265, and the Intergovernmental Cooperation Act. 31 U.S.C. § 6505. Transactive also argued that Treasury was illegally arbitrary when it did not sufficiently distinguish its actions related to the EBT proposal from its existing, and contradictory, policies.

On September 8, 1995, the district court granted summary judgment for Treasury. It dismissed Transactive's suit on various rationales, including that Treasury's interpretation of its authority under the National Bank Act was sufficiently reasonable to survive *Chevron* review, that Treasury's actions were not clearly arbitrary, and that part of Transactive's complaint was untimely. Transactive appealed the decision on September 11, 1995. One month later, on October 17, 1995, Treasury awarded the EBT contract to Citibank.

## DISCUSSION

### I. *Was the District Court able to review Treasury's decision to use an IEI proceeding?*

According to Treasury, once it chooses to disburse funds to private institutions who will then disburse these funds to individual credi-

tors of the government, rather than to disburse funds directly to these individuals from its own vaults, Treasury is legally required to use only private institutions that are duly-appointed federal financial agents. Because federal financial agents are routinely appointed through the IEI process, Treasury thus implies that Transactive's challenge to Treasury's use of an IEI proceeding in this case is actually a disguised attack on Treasury's alleged decision to disburse EBT payments via private institutions instead of disbursing the payments directly from its own accounts. Treasury then contends that a court cannot review such a disbursement decision.

■ Under the Administrative Procedure Act ("APA"), the legality of an agency action is presumptively subject to judicial review unless a statute "preclude[s] judicial review," 5 U.S.C. § 701(a)(1), the "action is committed to agency discretion by law," 5 U.S.C. § 701(a)(2), or the action is not final. 5 U.S.C. § 704; *see Abbott Laboratories v. Gardner*, 387 U.S. 136, 140–41, 87 S.Ct. 1507, 1511–12, 18 L.Ed.2d 681 (1967) (citing 5 U.S.C. § 702). The finality of Treasury's decision in this case has never been at issue. Instead, Treasury argues only that 31 U.S.C. § 3327, which permits Treasury to "designate a depositary [or financial agent] to issue a ... draft on public money held by the [agent] to pay an obligation of the Government" when the Treasury "decides it is convenient to a public creditor and in the public interest," sufficiently commits to Treasury's discretion the decision to disburse federal funds held by a financial agent rather than to disburse those held by Treasury itself as to preclude our review of such a decision. Because we conclude that this litigation does not actually involve such a decision, however, we reject Treasury's claim that the District Court could not have examined the merits of this matter, and leave its other reviewability concerns for another day. *See, e.g., Fried v. Hinson*, 78 F.3d 688, 692 (D.C.Cir.1996) ("Precedent and prudence limit comment on questions not essential to a decision, and our determination of the reviewability of [some agency] action is not essential." (internal citations omitted)); *see also Traynor v. Turnage*, 485 U.S. 535, 543–45, 108 S.Ct. 1372, 1379–80, 99 L.Ed.2d 618 (1988) (holding that court may review action despite presence of a "no review" statute because that statute did not extend to the question at issue).

*II. Was Treasury's decision to use an IEI based on an incorrect factor or otherwise arbitrary?*

■ Having concluded that the District Court could review Treasury's decision to use an IEI instead of more typical procurement procedures, we must now ask whether that review resulted in the correct substantive decision. We evaluate a district court's grant of summary judgment *de novo*. *See, e.g., Frito–Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1032 (D.C.Cir.1988). We cannot affirm its decision if the "materials offered in support of and in opposition to the motion" do not demonstrate that the movant was " 'entitled to judgment as a matter of law.' " *Id.* (quoting Fed.R.Civ.P. 56(c)). Based on our review of the materials before the District Court, we must reverse its decision because we conclude that Treasury was arbitrary in deciding to use an IEI proceeding to determine what party would administer its EBT contract.

In determining that Treasury acted improperly in this case, we need only examine whether its decision to use an IEI was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). In order to ensure that an agency's decision has not been arbitrary, we require the agency to have identified and explained the reasoned basis for its decision. *See F.J. Vollmer Co., Inc. v. Higgins*, 23 F.3d 448, 451 (D.C.Cir.1994); *National Treasury Employees Union v. Horner*, 854 F.2d 490, 498–99 (D.C.Cir.1988); *see also Checkosky v. SEC*, 23 F.3d 452, 491 n. 33 (D.C.Cir.1994) (Randolph, J., separate opinion) (listing examples of this principle). Although we have some difficulty concluding from the record on what precise grounds Treasury decided to use an IEI, we will assume *arguendo* that it chose the IEI process on the grounds suggested in its brief: that Treasury was obliged to select an EBT contractor through an IEI because only a financial agent of the federal government, which may be designated

through an IEI, would be able to fulfill the EBT contract.

■ Accepting this as the justification for Treasury's decision, we must then examine whether Treasury arbitrarily concluded that only a financial agent may actually administer the EBT program. *Cf. SEC v. Chenery Corp.*, 318 U.S. 80, 87–88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943) (reviewing the validity of an agency's legal interpretation that the agency claimed directed its result). A long line of precedent has established that an agency action is arbitrary when the agency offered insufficient reasons for treating similar situations differently. *See, e.g., Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 57, 103 S.Ct. 2856, 2874, 77 L.Ed.2d 443 (1983) (citing *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C.Cir.1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2229, 2233, 29 L.Ed.2d 701 (1971)); *Airmark Corp. v. FAA*, 758 F.2d 685, 691–92 (D.C.Cir.1985); *Local 777, Democratic Union Organizing Committee v. NLRB*, 603 F.2d 862, 872 (D.C.Cir. 1978). That Treasury has not previously embarked on such a large-scale, federal-state EBT model does not imperviously shield its conclusions regarding EBT from a claim of arbitrariness. *Cf. Davila–Bardales v. INS*, 27 F.3d 1, 5 (1st Cir.1994) (stating that, though the agency may not have officially established a specific policy in the precise type of case at issue, the agency still had to justify a change in that policy.). At the time of the IEI, Treasury already had in place at least two sets of regulations, one that spoke to federal disbursements in general, 31 C.F.R. Pt. 206 ("disbursement rules"), and one that spoke to any electronic funds transfer through the ACH method, 31 C.F.R. Pt. 210 ("EFT rules"), each of which, according to their own plain terms, should have encompassed EBT. *See, e.g.,* 31 C.F.R. §§ 206.1, 206.2, 210.1 & 210.2. Moreover, the workings of EBT recall in many ways another form of EFT, commonly known as direct deposit, with which Treasury has had considerable experience. In order to ensure that it had not acted arbitrarily in dealing with EBT, then, Treasury either had to conform its EBT policies to these apposite existing regulations or offer "reasoned analysis" for

why actual differences between EBT and other forms of EFT, such as direct deposit, justify any conflict between Treasury's policies as to each. *See Airmark Corp.*, 758 F.2d at 692 (citations omitted). Treasury has done neither.

### A. Does Treasury's current EBT policy conform to its relevant existing practice?

Treasury's demand that the EBT contractor must be able to be a financial agent for the federal government does not follow its established policies. Neither Treasury's EFT rules, its disbursement rules, nor the direct-deposit statute, 31 U.S.C. § 3332, demands that an institution must be a federal financial agent before it may maintain the account of some recipient of federal funds. *Compare* 31 C.F.R. § 210.2 (defining "financial institution" as typically used in EFT matters to mean "any bank, savings bank, savings and loan association, credit union, or similar institution") *with* 31 C.F.R. § 202.2 (defining the prerequisites a financial institution has to meet before it may be designated a financial agent); *see also* 31 C.F.R. § 206.2 (defining EFT, for purposes of all federal disbursement, as any electronic transfer of funds to or from any financial institution, not merely to or from financial agents); 31 U.S.C. § 3332 (also permitting direct deposit to any "financial institutions or other authorized payment agents"). In fact, the EFT rules specifically note that "[a] financial institution to which a payment is sent under this part does not thereby become a Federal Government depositary," 31 C.F.R. § 210.7(g), or, in other words, does not become—and therefore, cannot need to be—a federal financial agent.

### B. Having established that current EBT policy and existing EFT policies are in conflict, has Treasury justified the differences with "reasoned analysis"?

Faced with this contradiction between its own disbursement and EFT regulations and its claim that EBT must be run by a financial agent in order to operate legally, Treasury has nonetheless maintained that only finan-

cial agents may fulfill its EBT requirements. It explains this discrepancy between its newly-devised EBT policy and its existing practices and policies with regard to disbursement and EFT on two major grounds. As neither is sufficiently reasoned to justify Treasury's departure from its established practice, neither saves Treasury's explanation for using an IEI in this case.

### 1. Does the EBT program require the contractor to "disburse" public funds?

Most significantly, Treasury argues that the EBT program requires the institution holding individual EBT accounts to "disburse" public monies to its EBT recipients. Because Treasury then interprets a series of statutes, including 31 U.S.C. §§ 3321 & 3327, to mean that only the Secretary of the Treasury, disbursing officials, and that set of financial institutions that have been designated "Depositaries and Financial Agents of the Government," *see* 31 C.F.R. § 202.1, may disburse public monies, Treasury concludes that it has no choice but to award the EBT contract only to a party eligible to be a federal financial agent.

The flaw in this alleged distinction between EBT and direct deposit is fundamental: according to Treasury's own definitions, disbursement within any EFT system, which must be thought to include EBT, occurs when an electronic transfer from government accounts is *initiated.* 31 C.F.R. § 206.2. As defined in these disbursement rules, initiation occurs as soon as an electronic order authorizing some financial institution to debit or credit an account leaves Treasury. *Id.* Under the terms of this regulation, then, disbursement in an EBT system occurs as soon as the electronic order is sent from Treasury, even though the "electronic payment" may pass through another party en route to its destination, *see, e.g.,* 31 C.F.R. §§ 210.1, 210.6, 210.7, and even though Treasury may bear some liability for the transfer until the funds have actually been credited to the intended recipient's account. *See, e.g.,* 31 C.F.R. § 210.10.

Treasury tries to diminish the importance of its own regulation by arguing that we

should not think that the definition of "disburse" for a particular regulatory subpart necessarily articulates Treasury's definition of what constitutes disbursement within the meaning of that regulation's authorizing statute. Treasury offers no persuasive reason, however, for us to dispense with the common-sense assumption that, in the absence of some showing to the contrary, a term used in one aspect of the rules governing a particular subject should have a similar meaning if used in another aspect of those same rules. *Cf. Sullivan v. Stroop,* 496 U.S. 478, 484, 110 S.Ct. 2499, 2504, 110 L.Ed.2d 438 (1990) (applying the "normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning" to a single term used in two separate, but related, statutes (internal quotations omitted)). Although a statute may have broader application than a regulatory section it subsequently authorizes, the citizens affected by the resulting scheme should be able to anticipate that a definition for a term stated in the regulatory section bears some relevance to the meaning of that same term in the authorizing statute with regard to matters governed by the regulation. Thus, as this case examines when disbursement in an EBT system occurs, we must think arbitrary Treasury's assertion that a regulatory definition of "disburse" which expressly identifies when electronic disbursement takes place is unrelated to the meaning of "disburse" as used in that regulation's authorizing statute. Moreover, the expansive scope of the regulatory section in question, which explicitly "applies to all . . . monies . . . disbursed" by federal agencies, only confirms our result. 31 C.F.R. § 206.1. Despite our substantial deference to an agency's interpretation of the scope or application of its own regulations, *see, e.g., Thomas Jefferson Univ. v. Shalala,* —— U.S. ——, ——–——, 114 S.Ct. 2381, 2386–87, 129 L.Ed.2d 405 (1994), then we cannot allow Treasury to ignore its own regulation in an attempt to save its imperfect/unsatisfactory decision-making in this case. *See NLRB v. Washington Star Co.,* 732 F.2d 974, 977 (D.C.Cir.1984) (citing *Cappadora v. Celebrezze,* 356 F.2d 1, 6 (2d Cir.1966) (Friendly, J.)); *see also Secretary of Labor v. Western*

*Fuels–Utah, Inc.,* 900 F.2d 318, 323–24 (D.C.Cir.1990) (Edwards, J., dissenting) (noting that deference cannot require "court to endorse a[n agency] construction that finds no support whatsoever in the disputed provision" of that agency's regulation).

However, even were we somehow able to accept Treasury's assertion that its regulatory definition of disbursement might not necessarily apply to EBT on its face, we could not accept its discrepant and arbitrary treatment of EBT as compared to other forms of EFT. Simply stated, disbursement within the EBT system differs in no significant way from that which occurs in direct deposit. As in direct deposit, Treasury is the party responsible for directing an EBT payment, through the ACH network, to an individual's account. That a bank may play some intermediary role in guiding a "digital check" to that account does not make the bank the disburser any more than a credit union becomes the disburser if Treasury should transmit a "digital paycheck" to an individual account maintained by that credit union, *see* 31 C.F.R. §§ 210.6–.7, or any more than the Postal Service becomes the payor when an individual sends a dollar through the mail. Treasury itself admits at several points in the record that EBT payments will be transferred as are direct deposit payments. The senior director in charge of EBT at Citibank, the party that eventually received the EBT contract, also agreed that there is "virtually no difference in terms of accepting deposits" between EBT and direct deposit. Because Treasury has not demonstrated some relevant ground by which we may satisfactorily distinguish the mechanics of EBT from the mechanics of direct deposit, Treasury has no foundation on which to base its contradicting claims that an institution that maintains EBT accounts disburses public funds, but an institution that maintains accounts that receive direct deposits does not. *See, e.g., Garrett v. FCC,* 513 F.2d 1056, 1060 (D.C.Cir.1975) (holding that an agency acts arbitrarily when it treats seemingly similar situations dissimilarly without explaining any relevant factual differences between the situations).

Nor does Treasury's observation that "public monies" remain "public monies" until put in control of the intended recipient, *see Romney v. United States,* 167 F.2d 521, 526 (D.C.Cir.), *cert. denied,* 334 U.S. 847, 68 S.Ct. 1512, 92 L.Ed. 1771 (1948), support its claim that some party other than Treasury disburses "public monies" in the EBT program. The question in this case is not when the individual actually takes authority over his "digital check," but whether the "check" ever passes from an account held *by* Treasury to an account in another institution that is held *for* Treasury. It does not. Similar to other EFT payments made through the ACH method, the institution in which the recipient's EBT account is located at most serves as a waystation for the payment along the "EFT superhighway" before that payment "exits" into the proper individual's account. Thus, as this final attempt also does not provide a reasoned explanation for Treasury's belief that the institution that holds an EBT account actually "disburses" public funds to that account, we conclude that Treasury cannot base its decision to use an IEI on the arbitrary distinction that EBT, unlike direct deposit, involves disbursement by some party other than Treasury.

*2. Does an institution act as a financial agent when it establishes individual accounts?*

Treasury next relies on the *raison d'être* for the EBT program: the need to establish electronically-accessible accounts for benefit recipients who do not already have such accounts. Treasury argues that, unlike the direct deposit program, in which the recipient of public monies has already set up his own electronically-accessible account, the nature of the EBT program demands that the EBT contractor establish an individual recipient's account. Because, according to "elementary principles of agency law," Treasury "cannot create an agency relationship between two other parties," Treasury contends that the EBT contractor must act as the financial agent of Treasury in setting up an individual's account.

Treasury, however, mistakes its role in the EBT program. Treasury does not "create" an agency relationship between the institution and the individual recipient; rather,

Treasury arranges for such a relationship *on behalf of* the individual EBT recipient. Numerous statements by Treasury in the IEI and elsewhere in the record confirm that Treasury must obtain the consent, either explicitly or implicitly, from an individual recipient before it may seek an EBT account for that recipient at a particular institution. This consent then empowers Treasury to arrange an EBT account for the individual in the institution and at the terms Treasury thinks best. Treasury thus plays the role of an intermediary between the institution and a particular benefits recipient by inducing the institution to provide an EBT account to the recipient. That the institution agrees to provide this service to the individual recipient because of the inducements offered by Treasury does not transform the institution into an agent of Treasury, but rather simply encourages the institution to become an agent of the individual according to the terms of the IEI.

The general principles of agency law, when considered in light of Treasury's established practice of not requiring an institution receiving a direct deposit to be a financial agent of the government, verify this result. According to the RESTATEMENT (SECOND) OF AGENCY, "[a]n agent may be authorized to appoint another person to perform for the principal an act which the agent is authorized to ... have performed." § 5 cmt. a (1958). Assuming, as seems apparent, that Treasury is an agent of the individual recipient when Treasury selects which institution will create the individual EBT account, *see id.* at § 1, the issue becomes whether the institution Treasury selects for the individual is to be an agent only of that individual (the original principal) or will also serve as an agent of Treasury. According to the RESTATEMENT, if the institution selected by Treasury is, after being selected, "not to be the representative of [Treasury] but is to act solely on account of the principal," then the institution "is an agent" only of the original principal. *Id.* at § 5 cmt. a. In this case, two distinct observations illustrate that the institution selected by Treasury to hold the individual's account cannot be deemed Treasury's financial agent as a result of banking services rendered to Treasury.

First, the institution must be the financial agent of only the individual because the institution focuses on its relationship with the individual in all financial matters. The institution ascribes the EBT account it creates for the individual to the ownership of that individual, and gives only that individual access to funds in the account. The institution then maintains the account for the individual in response to the individual's withdrawals and deposits. *Id.* The institution also charges the individual, not Treasury, any monthly or additional fees associated with the EBT account.

Second, the institution cannot need to be a financial agent of the government once it has been selected as the party that will administer the individual's EBT account because, as previously discussed, once an EBT account is established, EBT is no different from other forms of EFT. *See supra* part II.B.1. As Treasury explicitly refuses to treat an institution as a public depositary (or financial agent) simply because, for example, it handles paychecks electronically sent to federal employees through direct deposit, *see, e.g.,* 31 C.F.R. § 210.7(g), we must, in the absence of some reason to think otherwise, similarly conclude that an institution participating in an EBT program does not act as an agent of Treasury when it handles benefit payments to its EBT accounts.

Nor does case law compel us to think that an IEI was warranted. Treasury argues that the Federal Circuit's decision in *United States v. Citizens & Southern National Bank,* 889 F.2d 1067 (Fed.Cir.1989), substantiates Treasury's claim that it may avoid typical procurement rules as long as it does not actually purchase goods or services. In this case, however, Treasury neither acts as a principal to the institution it selects to administer the EBT program nor delegates to this institution "some of the sovereign functions that the government itself would otherwise perform," as *Citizens & Southern National Bank* suggests are characteristics of any proper use of Treasury's power to appoint financial agents. *Id.* at 1069. Because the EBT contractor does not disburse public funds or engage in some other sover-

eign function, we find that the rationale underlying *Citizens & Southern National Bank* in fact supports our decision that Treasury did not need to appoint a financial agent through an IEI process in this case. Although that court did imply that CICA or FAR applies to Treasury "only when it is acting as a commercial purchaser of goods and services," *id.*, that court simply did not foresee a decision by Treasury, such as the one made here, to designate a party a financial agent even though it has expressly declined to name as financial agents others that perform similar tasks. Otherwise, the precedent cited by Treasury is not apposite.

## CONCLUSION

An agency must endure judgment on the "grounds upon which [its] administrative order ... was based." *Chenery Corp.*, 318 U.S. at 87, 63 S.Ct. at 459. Before this and the District Court, Treasury has consistently argued that the record shows it used an IEI proceeding to select the party who would administer at least the federal aspect of the EBT program for a very simple reason: it had to. According to Treasury, it had to use an IEI because that is the method it uses to designate financial agents of the federal government, and, again according to Treasury, the EBT contract could only be legally administered by a federal financial agent. On this last point—its basis for justifying its choice for an IEI—Treasury was mistaken. We have no reason to conclude that EBT, unlike its kindred programs, direct deposit and EFT in general, demands the involvement of a financial agent. Not only do we have no basis from which to conclude that EBT, any more than direct deposit or EFT, involves a disbursement by the institution that holds the accounts designated to receive the transferred payments, but we have no other basis for concluding that EBT requires that institution to act as a financial agent to Treasury. As we thus have been presented no reasoned explanation for Treasury's decision to use an IEI rather than CICA procedures to select an EBT contractor, we must reverse the District Court's decision to grant Treasury summary judgment, and we remand this matter to the District Court with instructions to further remand it to Treasury for proceedings not inconsistent with this opinion.