# United States Court of Appeals
## For the First Circuit

No. 19-2019

ANA RUTH HERNANDEZ-LARA,

Petitioner, Appellee,

v.

TODD M. LYONS, Immigration and Customs Enforcement, Enforcement
and Removal Operations, Acting Field Office Director,

Respondent, Appellant,

CHRISTOPHER BRACKETT, Superintendent, Strafford County
Department of Corrections,

Respondent.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Landya B. McCafferty, U.S. District Judge]

Before

Lynch, Lipez, and Kayatta,
Circuit Judges.

Catherine M. Reno, Trial Attorney, with whom Ethan P. Davis,
Acting Assistant Attorney General, Civil Division, Scott G.
Stewart, Deputy Assistant Attorney General, William C. Peachey,
Director, Office of Immigration Litigation, District Court
Section, Carlton F. Sheffield, Senior Litigation Counsel, and Ari
Nazarov, Trial Attorney, were on brief, for appellant.
Bryanna K. Devonshire, with whom Courtney H.G. Herz, Sheehan
Phinney Bass & Green, PA, Gilles Bissonnette, Henry Klementowicz,
SangYeob Kim, and American Civil Liberties Union of New Hampshire,

were on brief, for appellee.

August 19, 2021

**KAYATTA**, **Circuit Judge**. Ana Ruth Hernandez-Lara ("Hernandez"), a thirty-four-year-old native and citizen of El Salvador, entered the United States in 2013 without being admitted or paroled. An immigration officer arrested Hernandez in September 2018, and the government detained her at the Strafford County Department of Corrections in Dover, New Hampshire ("Strafford County Jail") pending a determination of her removability. Approximately one month later, Hernandez was denied bond at a hearing before an immigration judge (IJ) in which the burden was placed on Hernandez to prove that she was neither a danger to the community nor a flight risk.

Hernandez subsequently filed a petition for a writ of habeas corpus in the United States District Court for the District of New Hampshire, contending that the Due Process clause of the Fifth Amendment entitled her to a bond hearing at which the government, not Hernandez, must bear the burden of proving danger or flight risk by clear and convincing evidence. The district court agreed and ordered the IJ to conduct a second bond hearing at which the government bore the burden of proving by clear and convincing evidence that Hernandez was either a danger or a flight risk. That shift in the burden proved pivotal, as the IJ released Hernandez on bond following her second hearing, after ten months of detention. The government now asks us to reverse the judgment

- 3 -

of the district court, arguing that the procedures employed at Hernandez's original bond hearing comported with due process and, consequently, that the district court's order shifting the burden of proof was error. Although we agree that the government need not prove a detainee's flight risk by clear and convincing evidence, we otherwise affirm the order of the district court. Our reasoning follows.

## I.

The parties do not dispute the relevant background facts. Hernandez was born in Usulutan, El Salvador, in 1986. Before coming to the United States in 2013, her life was marred by abusive domestic relations and gang violence. Hernandez's stepfather raped her when she was twelve years old and beat her mother throughout Hernandez's childhood. History repeated when Hernandez's stepfather's son raped Hernandez's then-eight-year-old daughter. Although Hernandez escaped her stepfather by living with her brother, she was unable to escape danger. Hernandez's brother was a member of Mara 18 (the 18th Street Gang), and after he was imprisoned for gang-related crimes, the gang began threatening Hernandez in an effort to force her to assume her brother's former gang responsibilities. Hernandez resisted those threats until late August 2013, when the gang told her aunts they intended to kill her and "throw [her] head in the river."

- 4 -

Hernandez immediately fled to the United States and ultimately established residency in Portland, Maine, where she worked at a recycling plant and was engaged to be married.

Hernandez was taken into custody by an immigration officer on September 20, 2018, and detained pursuant to 8 U.S.C. § 1226(a), which provides for discretionary detention of noncitizens during the pendency of removal proceedings.[1]  On October 18, 2018, the IJ held a bond hearing at which, consistent with immigration regulations, the burden of proof was placed on Hernandez to prove she was neither a danger to the community nor a flight risk.  See Matter of Guerra, 24 I. & N. Dec. 37, 40 (B.I.A. 2006).  Hernandez presented evidence that she had no criminal record or history of arrest in either El Salvador or the United States.  She also offered evidence of her good moral character and her community and family ties to Portland.  Both her parents and two of her three siblings reside in the United States.

The government's response provided an apt demonstration of how the burden of proof can affect immigration bond hearings. Government counsel produced a so-called "Red Notice" published by

---

[1]  8 U.S.C. § 1226(a) provides that "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States.  Except as provided in subsection (c) and pending such decision, the Attorney General . . . (1) may continue to detain the arrested alien; and (2) may release the alien on . . . bond of at least $1,500 . . . or conditional parole."

El Salvador through the International Criminal Police Organization ("INTERPOL"). The notice identifies Hernandez, describes the activities of Street Gang 18 (much as Hernandez described them), and simply states that Hernandez is subject to an arrest warrant in El Salvador under El Salvadoran "Article 13 of the Special Law Against Acts of Terrorism."

An INTERPOL Red Notice is "a request to law enforcement worldwide to locate and provisionally arrest a person pending extradition, surrender, or similar legal action." Red Notices, INTERPOL, https://www.interpol.int/en/How-we-work/Notices/Red-Notices (last visited August 18, 2021). In the United States, an INTERPOL Red Notice alone is not a sufficient basis to arrest, much less detain or extradite, the "subject" of the notice "because it does not meet the requirements for arrest under the 4th Amendment to the Constitution." About INTERPOL Washington: Frequently Asked Questions, U.S. Dep't of Just., https://www.justice.gov/interpol-washington/frequently-asked-questions (last visited August 18, 2021).

Hernandez denied belonging to the organization. Her counsel explained that her brother had belonged to the gang and pointed out that the Red Notice failed to specify any criminal or dangerous act that Hernandez allegedly committed.

The IJ indicated that it was not clear whether Hernandez's alleged involvement in the organization was due to "an inter-rival thing or [if] she was an innocent member or somehow wrongly identified." Nonetheless, he found that there was not "sufficient evidence explaining why these allegations are being brought against her." Stating that "it is [Hernandez's] burden of proof to show by clear and convincing evidence she is not a danger," the IJ found, "based on this Red Notice, [that] she has failed to meet that burden." Consequently, he denied her request for bond. Hernandez remained detained as she pursued claims for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT").

On April 16, 2019, Hernandez filed a petition for a writ of habeas corpus in the United States District Court for the District of New Hampshire. In her petition, Hernandez claimed that due process required the government to bear the burden of proving, by clear and convincing evidence, that she was either dangerous or a flight risk, and therefore that her initial bond hearing was constitutionally inadequate. Hernandez also claimed that because of her "prolonged detention" of over six months, due process required an additional bond hearing at which the government would bear the burden of proof. Hernandez sought as relief either her immediate release or a new bond hearing at which the government

would bear the burden of proving by clear and convincing evidence that she was dangerous or a flight risk.

On July 25, 2019, the district court granted Hernandez's habeas petition and ordered the IJ to conduct another bond hearing at which the government would "bear the burden of justifying Hernandez's detention by clear and convincing evidence." Hernandez-Lara v. Immigr. & Customs Enf't, Acting Dir., No. 19-cv-394-LM, 2019 WL 3340697, at *7 (D.N.H. July 25, 2019).[2] Less than a week later, the same IJ who conducted Hernandez's first bond hearing held a second hearing in accordance with the district court's order. The government relied once again on the Red Notice and additionally argued that Hernandez was a flight risk because her asylum claim had been denied by both the IJ and the Board of Immigration Appeals (BIA), though it was pending before this court at the time. Hernandez countered that the Red Notice was defective, as it contained no factual allegations that Hernandez committed any crime or was part of any gang activity, and that she has no history of criminal conviction. As to flight risk, Hernandez argued she had a meaningful chance of relief in her appeal before us and that she had family ties, employment, and a residence in Maine to which she would return.

---

[2] The district court did not reach Hernandez's prolonged detention argument, id. at *7 n.4, which we likewise do not address.

The IJ granted Hernandez's request for bond, setting it at $7,500. In explaining his decision, the IJ stressed the shift of burden:

> Because the burden of proof is now on the Government, I do find that to be outcome determinative in this case for the reasons I stated in [the first bond hearing]. While [Hernandez] does have accusations, absent any other details or any other evidence, I'm able to conclude that it isn't clear and convincing to show that she's a danger, especially where she has no other criminal history here in the United States.

Given her community ties, fixed address, and work history, the IJ also found that Hernandez was not a flight risk. As a result, the IJ released Hernandez after she spent over ten months in detention.

As noted, the IJ had previously denied Hernandez's asylum, withholding, and CAT claims on the merits, finding her credible but also concluding that "she failed to demonstrate that her familial connection to her brother was 'one central reason' that the gang singled her out" and that "the police would have protected [her] from the gang if she had reported the threats because the police had protected her from her ex-partner in the past." Hernandez Lara v. Barr, 962 F.3d 45, 52 (1st Cir. 2020). After the BIA affirmed that ruling, Hernandez appealed. Nearly a year after Hernandez was released from custody, we vacated the BIA's decision and remanded for further proceedings, which are ongoing. See id. In the meantime, the government filed this

appeal from the district court's grant of Hernandez's habeas petition.

## II.

"It is well established that '[o]ur review of a district court's grant or denial of habeas is de novo.'" Sanchez v. Roden, 753 F.3d 279, 293 (1st Cir. 2014) (alteration in original) (quoting Healy v. Spencer, 453 F.3d 21, 25 (1st Cir. 2006)). Before undertaking that review, we first survey the statutory and regulatory framework challenged by Hernandez.

The Immigration and Nationality Act ("INA") provides that the government must detain for the duration of removal proceedings most noncitizens who have committed certain types of criminal offenses. 8 U.S.C. § 1226(c). See generally Demore v. Kim, 538 U.S. 510 (2003). The government does not claim that Hernandez has committed such an offense. In her case, section 1226(a) -- the discretionary detention provision -- controls. Under that section, the government "may release" a detained noncitizen on "bond . . . or conditional parole." Id. § 1226(a).

An Immigration and Customs Enforcement ("ICE") officer makes the initial detention determination for noncitizens subject to detention under section 1226(a). See 8 C.F.R. § 236.1(c)(8) (2020). If the officer opts for continued detention, the

- 10 -

noncitizen can seek review of that decision at a bond hearing before an IJ. Id. § 236.1(d)(1). An IJ's decision to continue detaining a noncitizen may be further appealed to the BIA. Id. § 236.1(d)(3).

Section 1226(a) is silent as to what burden of proof applies in bond hearings and who bears that burden. See 8 U.S.C. § 1226(a). For many decades, the BIA interpreted that silence as creating a presumption in favor of liberty pending removal proceedings. See Matter of Patel, 15 I. & N. Dec. 666, 666 (B.I.A. 1976) ("An alien generally is not and should not be detained or required to post bond except on a finding that he is a threat to the national security or that he is a poor bail risk." (citations omitted)).

In 1996 Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"). Omnibus Consolidated Appropriations Act, Pub. L. No. 104-208, 110 Stat. 3009 (1996). IIRIRA adopted what is now the current version of the mandatory detention requirements of section 1226(c). IIRIRA did not alter the discretionary regime of section 1226(a) except by increasing the minimum bond amount from $500 to $1,500.

Nevertheless, following the enactment of IIRIRA, the Immigration and Naturalization Service (INS) adopted new regulations establishing a presumption of detention in the initial

custody determination by the arresting officer. See 8 C.F.R. § 236.1(c)(2)-(8). Under those regulations, a noncitizen seeking release bears the burden of "demonstrat[ing] to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding." Id. § 236.1(c)(8). Although that regulation applied only to the custody determination by the arresting officer, the BIA soon adopted that standard for section 1226(a) bond hearings before an IJ, reversing its prior rule. See Matter of Adeniji, 22 I. & N. Dec. 1102, 1112 (B.I.A. 1999); Matter of Guerra, 24 I.& N. Dec. at 38.

Accordingly, under current BIA precedent, a noncitizen detained under section 1226(a) must demonstrate "to the satisfaction of the Immigration Judge that he or she merits release on bond," Matter of Guerra, 24 I. & N. Dec. at 40, "even though section [1226(a)] does not explicitly contain such a requirement." Matter of Adeniji, 22 I. & N. Dec. at 1113. To do so, the noncitizen must prove that he or she is neither a danger to the community nor a flight risk. See, e.g., Matter of R-A-V-P-, 27 I. & N. Dec. 803, 804 (B.I.A. 2020).[3] In contrast, the government

---

[3] In deciding whether the noncitizen has met his or her burden, the IJ may consider "any or all of the following: (1) whether the alien has a fixed address in the United States; (2) the alien's length of residence in the United States; (3) the

"need not show anything to justify incarceration for the pendency of removal proceedings, no matter the length of those proceedings." Velasco Lopez v. Decker, 978 F.3d 842, 849 (2d Cir. 2020).

## III.

We turn now to the merits of this appeal.  In Jennings v. Rodriguez, the Supreme Court held that, as a matter of statutory interpretation, section 1226(a) does not require "periodic bond hearings every six months in which the Attorney General must prove by clear and convincing evidence that the alien's continued detention is necessary."  138 S. Ct. 830, 847-48 (2018).  The Court left for another day, however, the constitutional question now before us:  Whether the Due Process clause of the Fifth Amendment entitles a noncitizen detained pursuant to section 1226(a) to a bond hearing at which the government bears the burden of proving by clear and convincing evidence that the noncitizen is dangerous or a flight risk.  See id. at 851.

---

alien's family ties in the United States, and whether they may entitle the alien to reside permanently in the United States in the future; (4) the alien's employment history; (5) the alien's record of appearance in court; (6) the alien's criminal record, including the extensiveness of criminal activity, the recency of such activity, and the seriousness of the offenses; (7) the alien's history of immigration violations; (8) any attempts by the alien to flee prosecution or otherwise escape from authorities; and (9) the alien's manner of entry to the United States."  Matter of Guerra, 24 I. & N. Dec. at 40.

Our inquiry is guided by the three-part balancing test articulated in Mathews v. Eldridge. See 424 U.S. 319, 335 (1976); see also Velasco Lopez, 978 F.3d at 851 (analyzing procedural due process challenge to prolonged detention of noncitizen held pursuant to section 1226(a) using Mathews test); Addington v. Texas, 441 U.S. 418, 425 (1979) (analyzing "what standard should govern in a civil commitment proceeding" by "assess[ing] both the extent of the individual's interest in not being involuntarily confined indefinitely and the state's interest in committing the emotionally disturbed under a particular standard of proof" (citing Mathews, 424 U.S. at 335)). The Mathews factors are: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. at 335.

We address each factor in turn, focusing first on the allocation of the burden of proof. We then address separately the government's contention that, notwithstanding any analysis of the Mathews factors, precedent calls for us to rule in the government's favor. Finally, we address the extent of the burden to be borne.

- 14 -

**A.**

"Freedom from imprisonment -- from government custody, detention, or other forms of physical restraint -- lies at the heart of the liberty that [the Due Process] Clause protects." Zadvydas v. Davis, 533 U.S. 678, 695 (2001) (citing Foucha v. Louisiana, 504 U.S. 71, 80 (1992)). The Supreme Court has repeatedly affirmed that "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." United States v. Salerno, 481 U.S. 739, 755 (1987); see also Foucha, 504 U.S. at 80 ("We have always been careful not to minimize the importance and fundamental nature of the individuals' right to liberty."). For this reason, "civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protections." Addington, 441 U.S. at 425 (emphasis added).

Hernandez was incarcerated alongside criminal inmates at the Strafford County Jail for over ten months. See Velasco Lopez, 978 F.3d at 850 ("[Petitioner] was not 'detained'; he was, in fact, incarcerated under conditions indistinguishable from those imposed on criminal defendants sent to prison following convictions for violent felonies and other serious crimes.") During that time, she was separated from her fiancé and unable to maintain her employment. But for the relief ordered in this action, she would

still be incarcerated more than two years after the jailor first locked the door behind her. There is no question that Hernandez suffered a substantial deprivation of liberty.

In an attempt to downplay that deprivation, the government notes that Congress may make rules for noncitizens "that would be unacceptable if applied to citizens," Demore, 538 U.S. at 522, and that "detention during deportation proceedings [is] a constitutionally valid aspect of the deportation process," id. at 523. But the same could be said for criminal proceedings. And in either case the fact that some detention is permissible does not change the fact that a detainee suffers significant liberty deprivations. Moreover, the government's exercise of its power to detain immigrants pending removal "is subject to important constitutional limitations." Zadvydas, 533 U.S. at 695. That is because due process "applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." Id. at 693; see also Mathews v. Davis, 426 U.S. 67, 77 (1976) (explaining that due process "protects every [noncitizen] from deprivation of life, liberty, or property without due process of law. Even one whose presence in this country is unlawful, involuntary, or transitory is entitled to that constitutional protection").

- 16 -

The government also argues that Hernandez's liberty interest should be discounted because she is "not simply asserting a right to be at liberty, but rather, a right to be at liberty in the United States, where she has never held lawful status" (emphasis in original). But as the Supreme Court explained in response to this same type of argument in Zadvydas, "the choice . . . is not between imprisonment and the alien 'living at large'" in this country but "between imprisonment and supervision under release conditions that may not be violated." 533 U.S. at 696; see 8 U.S.C. § 1226(a)(2)(A) (providing that the Attorney General may release a noncitizen on "bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General" (emphasis added)).

The government next contends that "individuals detained under section 1226(a) can unilaterally decide to end their detention at any time by simply conceding to removal and being released into their home country." For that reason, the government asserts, Hernandez's liberty interest is less than that of the detainees in Addington and Foucha, who faced indefinite confinement and could only end their detention by "meeting a disputed burden of proof."

This argument is a bit like telling detainees that they can help themselves by jumping from the frying pan into the fire.

Deportation is a "'drastic measure,' often amounting to lifelong 'banishment or exile.'" Sessions v. Dimaya, 138 S. Ct. 1204, 1213 (2018) (quoting Jordan v. De George, 341 U.S. 223, 231 (1951)); see id. ("[D]eportation is 'a particularly severe penalty,' which may be of greater concern to a convicted alien than 'any potential jail sentence.' (quoting Jae Lee v. United States, 137 S. Ct. 1958, 1968 (2017))); Bridges v. Wixon, 326 U.S. 135, 147 (1945) ("[D]eportation may result in the loss 'of all that makes life worth living.'" (quoting Ng Fung Ho v. White, 259 U.S. 276, 284 (1922))). The consequences of deportation are potentially most severe for meritorious asylum seekers, for whom one might fairly say that the escape from detention offered by the government could be death. Accordingly, like the Ninth Circuit, "[w]e are not persuaded that a lower standard of proof is justified by putting people . . . to the choice of remaining in detention, potentially for years, or leaving the country and abandoning their challenges to removability even though they may have been improperly deemed removable." Singh v. Holder, 638 F.3d 1196, 1204 (9th Cir. 2011).

We recognize that removal proceedings have an end point and that the liberty interest of a noncitizen detained under section 1226(a) may therefore be slightly less weighty than that of individuals facing indefinite and prolonged detention. But only slightly less: The exact length of detention under

section 1226(a) is impossible to predict and can be quite lengthy, as Hernandez's case illustrates well. The ten months Hernandez was incarcerated, not to mention the two-plus years, and counting, during which Hernandez would have been detained but for the relief ordered by the district court, significantly exceeds the "very limited time of the detention at stake" in Demore, which was found to "last[] roughly a month and a half in the vast majority of cases . . . and about five months in the minority of cases in which the [non-citizen] chooses to appeal." 538 U.S. at 530; see id. at 513, 526, 529 n.12 (emphasizing the "brief" and " very limited" period of detention). Moreover, "[d]etention under § 1226(a) is frequently prolonged because it continues until all proceedings and appeals are concluded . . . even where an individual has prevailed and the Government appeals." Velasco Lopez, 978 F.3d at 852. Unsurprisingly, Hernandez is far from an outlier. See Pereira Brito v. Barr, 415 F. Supp. 3d 258, 264-65 (finding that between November 1, 2018 and May 7, 2019, among section 1226(a) detainees subject to the jurisdiction of the Boston and Hartford Immigration Courts, one in four was incarcerated for two years or longer).[4]

---

[4] Given our holdings, infra, we need not and do not reach Hernandez's alternative argument that once her detention exceeded six months she became entitled to a new bond hearing at which the government bears the burden of proof. Nonetheless, we find the

Accordingly, we find that the first <u>Mathews</u> factor (the private interest at stake) weighs heavily in Hernandez's favor.

**B.**

For several reasons, the second <u>Mathews</u> factor -- "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards" -- likewise weighs heavily in Hernandez's favor. 424 U.S. at 335.

First, noncitizens have no right to be provided with counsel in immigration proceedings and very often cannot obtain counsel on their own, particularly if they are detained. <u>See</u> 8 U.S.C. § 1362; Ingrid V. Eagly & Steven Shafer, <u>A National Study of Access to Counsel in Immigration Court</u>, 164 U. Pa. L. Rev. 1, 16, 32 (2015) (analyzing over 1.2 million deportation cases decided between 2007 and 2012 and finding that 37% of noncitizens, and only 14% of detained noncitizens, were represented by counsel); Emily Ryo, <u>Detained: A Study of Immigration Bond Hearings</u>, 50 Law & Soc'y Rev. 117, 119 (2016) (finding that "the odds of being granted bond are more than 3.5 times higher for detainees represented by attorneys than those who appeared <u>pro se</u>").

---

potential length of detention under section 1226(a) relevant to the weight of the liberty interest at stake.

Second, detained individuals will likely experience difficulty in gathering evidence on their own behalf. See Moncrieffe v. Holder, 569 U.S. 184, 201 (2013) (noting detained noncitizens "have little ability to collect evidence"); Hernandez Lara, 962 F.3d at 55 ("Detainees' access to phone calls and visits is generally limited . . . ."); Velasco Lopez, 978 F.3d at 852-53 (government refused to produce detained noncitizen's DACA records or bring him to a criminal hearing so charges against him could be dismissed).

Third, noncitizens subject to immigration detention often lack full proficiency in English. See, e.g., Hernandez Lara, 962 F.3d at 55 (noting that Hernandez "does not speak, read, or write English").

Fourth, immigration law and procedures and the particular preferences of individual IJs are likely much better known to government representatives than to detainees. Cf. Santosky v. Kramer, 455 U.S. 745, 763 (1982) (noting heightened risk of error in parental rights termination proceedings exists in part because "[t]he State's attorney usually will be an expert on the issues contested and the procedures employed at the factfinding hearing").

Finally, proving a negative (especially a lack of danger) can often be more difficult than proving a cause for

concern.  See Elkins v. United States, 364 U.S. 206, 218 (1960) ("[A]s a practical matter it is never easy to prove a negative."). For all of these reasons, a detainee often starts out behind the eight ball in a bond proceeding, and the opportunities for prejudicial error abound.

This very case evidences how the allocation of the burden of proof can affect the likelihood of such error.  With a record of employment, family relations, a settled place in the community, and no arrests, Hernandez would seem to have been a good candidate for conditional release on bail.  Indeed, no party claims that she has absconded or committed any crime during the year and a half that she has been out on bail.  Yet as the IJ's rulings make clear, the placement of the burden of proof on Hernandez decisively exploited her inability to rebut the Red Notice, even though it did not specify a single act of criminal or dangerous conduct.

As the Supreme Court has observed, a noncitizen's "removable status itself . . . bears no relation to a detainee's dangerousness."  Zadvydas, 533 U.S. at 691-92.  Thus, as a practical matter, adjudication of dangerousness will naturally tend to begin with the government offering a reason to find a particular person dangerous, with that person then addressing the proffered reason.  And that reason will in most cases be based on law enforcement records to which the government will have greater

access.  See Velasco Lopez, 978 F.3d at 853 (explaining that the government has access to "numerous databases[,] . . . to information collected by DHS, DOJ, and the FBI, [and to] information in the hands of state and local authorities," in addition to having "broad regulatory authority" to obtain information it does not have readily available).  Here, for example, it was the government that had access to the Red Notice.  For all these reasons, the government is generally far more able to meet the burden of proof on the question of danger than a detained noncitizen like Hernandez.

As the government argues, detained noncitizens may certainly have a better grasp of some information relevant to flight risk -- such as family ties, length of time in the United States, or record of employment.  Nevertheless, they also face significant barriers to accessing such evidence in the wake of their seizure and initial detention.  Moreover, none of this is to say that an IJ cannot draw a negative inference from the fact that a detainee offers no evidence on her behalf.  Rather, it is to say that the odds of error in the weighing of such evidence (or its absence) are likely reduced by placing the burden on the government, as in virtually all other instances of proposed lengthy detention.

The government's response to all of this is to argue that for two reasons the existing framework provides procedural protections that "exceed the constitutional minimum." First, the government points out that the existing procedures "permit an immigration judge to consider a wide range of factors, and the alien to present any evidence that may bear on these factors." But as Hernandez's experience shows, those protections do little to reduce the risk of error caused by the regulations' burden allocation. Second, the government notes that detention determinations are subject to "three levels of independent review," as the decision is made first by a DHS officer, with review by an IJ and the option of appeal to the BIA. But because the burden is always on the noncitizen, the availability of review does little to change the risk of error inherent in the current burden allocation. Loaded dice rolled three times are still loaded dice.[5]

---

[5] The government also suggests in a related case that because section 1226(a) allows detention of any noncitizen pending removal proceedings, the "only true sense" in which a noncitizen may be "erroneously deprived" of liberty under section 1226(a) is "if that individual should not be in removal proceedings at all." But even under the agency's current regulations, there is no suggestion that the government could detain a noncitizen who has shown he is not a danger or flight risk. More fundamentally, any detention must "bear[] [a] reasonable relation to [its] purpose," Zadvydas, 533 U.S. at 690, and other than guarding against danger or flight risk, the government offers no conceivable purpose served by detention.

## C.

We turn to the final Mathews factor -- "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail" -- which ultimately entails an assessment of the "public interest." 424 U.S. at 335, 347. The government's proffered interest is the "public interest in prompt execution of removal orders" and the "importance of immigration detention to effectuate immigration proceedings." In support of this interest, the government points to legislative history stating that section 1226(a) was enacted based on concern that "[a] chief reason why many deportable aliens are not removed from the United States is the inability of [immigration officials] to detain such aliens through the course of their deportation proceedings." H.R. Rep. 104-469, pt. 1, at 123 (1996). Of course, Congress's answer was to focus on certain criminal noncitizens, not to alter in any way the then-prevailing burden allocation in section 1226(a) proceedings.

The prompt execution of removal orders is a legitimate governmental interest, see Nken v. Holder, 556 U.S. 418, 436 (2009), which detention may facilitate, see Aguilar v. U.S. Immigr. & Customs Enf't, 510 F.3d 1, 22 (1st Cir. 2007) (recognizing "the government's legitimate interest in effectuating detentions

pending the removal of persons illegally in the country"). In considering that interest, we must "weigh heavily" the fact that "control over matters of immigration is a sovereign prerogative, largely within the control of the executive and the legislature." Landon v. Plasencia, 459 U.S. 21, 34 (1982). What is at stake, however, is not the power of the government to detain noncitizens who may cause harm or flee during removal proceedings, but rather who should bear the burden of proving noncitizens pose a danger or a flight risk.

The government fails to explain why its proffered interest in securing appearance at removal proceedings and for deportation holds sway where a noncitizen is not a flight risk. See Hernandez v. Sessions, 872 F.3d 976, 990 (9th Cir. 2017) ("The government has legitimate interests in protecting the public and in ensuring that noncitizens in removal proceedings appear for hearings, but any detention incidental to removal must 'bear[] [a] reasonable relation to [its] purpose.'" (quoting Zadvydas, 533 U.S. at 690)); see also Ingrid Eagly et. al., Detaining Families: A Study of Asylum Adjudication in Family Detention, 106 Cal. L. Rev. 785, 848 (2018) (finding that during the period 2001 to 2016, "86% of family detainees attended all their court hearings" after release from detention, and among those seeking asylum, "96% attend[ed] all their hearings"). The only argument the government

- 26 -

makes in that regard is that noncitizens are in a better position to present evidence as to flight risk and that obtaining records from state and local authorities consumes government resources. But as a practical matter, the government already has a strong incentive to obtain criminal records even under existing bond procedures; we doubt very much that shifting the burden will cause the government to expend more than minimal additional resources obtaining such records. In fact, limiting the use of detention to only those noncitizens who are dangerous or a flight risk may save the government, and therefore the public, from expending substantial resources on needless detention. See Velasco Lopez, 978 F.3d. at 854 n.11 ("Detention [of noncitizens] costs taxpayers approximately $134 per person, per day, according to ICE's estimates." (citing Dep't of Homeland Sec., U.S. Immigr. & Customs Enf't Budget Overview (2018) at 14)).

Perhaps more importantly, such unnecessary detention imposes substantial societal costs. This case illustrates those costs well: Because of her incarceration, Hernandez was separated from her fiancé and unable to maintain her employment, after living peacefully in Portland for over a year. More generally, noncitizens subject to immigration detention include spouses, children, and parents of U.S. citizens, caretakers of children and elderly relatives, and leaders in religious, cultural, and social

groups. The needless detention of those individuals thus "separates families and removes from the community breadwinners, caregivers, parents, siblings and employees." See Id. at 855. Those ruptures in the fabric of communal life impact society in intangible ways that are difficult to calculate in dollars and cents. Even so, as twenty states report in an amicus brief to this court, the financial costs imposed by such widespread communal disruption are severe: "[States'] revenues drop because of reduced economic contributions and tax payments by detained immigrants, and their expenses rise because of increased social welfare payments in response to the harms caused by unnecessary detention."

In short, given the risk that the current procedures lead to many instances of needless detention, entailing substantial social and financial costs, the public interest in placing the burden of proof on the detainee is uncertain at best, and may well be negative.

Pointing to section 1226(a), as well as a related provision, 8 U.S.C. § 1226(e), the government next argues that the procedures sought by Hernandez are "contrary to Congress's intent that such matters be left to the Attorney General's unreviewable discretion." See 8 U.S.C. § 1226(e) ("The Attorney General's discretionary judgment regarding the application of this section shall not be subject to review. No court may set aside any action

or decision by the Attorney General under this section regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole."). To the extent the government is arguing that section 1226(e) deprives the district court or this court of jurisdiction, that claim fails: Hernandez does not challenge the IJ's ultimate exercise of discretion, but rather "the extent of the Government's detention authority under the 'statutory framework' as a whole." Jennings, 138 S. Ct. at 841.[6] Moreover, though our decision cabins the discretion granted by section 1226(a) through the constitutional restraints applicable to all government action, see Zadvydas, 533 U.S. at 695 (explaining that, despite Congress's "'plenary power' to create immigration law, . . . Executive and Legislative Branch decisionmaking in that area . . . is subject to important constitutional limitations"), within those limits the government maintains discretion in each case to grant or deny bond.

Likewise, the government makes much of the Court's statement in Nielsen v. Preap that section 1226(a) gives the government "broad discretion" to detain or release noncitizens.

---

[6] For similar reasons, the Court's statement in its pre-Mathews decision of Carlson v. Landon, 342 U.S. 524 (1952), that Congress intended the "Attorney General's exercise of discretion" regarding the detention of Communists to be "presumptively correct and unassailable except for abuse," is inapposite. 342 U.S. at 540.

139 S. Ct. 954, 966 (2019). But in context, it is clear the Court was merely contrasting section 1226(a) with section 1226(c), which mandates detention of certain noncitizens.

Shifting gears, the government contends that it would be "backwards" to "put the burden on the Government to justify the alien's detention during the interim period when the Government is pursuing removal when the burden is on the alien [to prove that he or she was admissible or to prove a defense to removal] in the underlying removal proceedings themselves." See 8 U.S.C. § 1229a(c)(2), (c)(4)(A). This superficially appealing logic is flawed because the success or failure of a removal defense is outcome determinative in the removal proceeding, yet it serves as only one of several factors potentially relevant to gauging whether a person is a flight risk pending the removal decision. Moreover, any assessment of a removal defense at the bond hearing -- a preliminary stage in the removal proceedings at which point the noncitizen likely lacks evidence relevant to his or her defense -- is necessarily tentative. And nothing in our ruling precludes an IJ from considering the applicable burden when assessing the strength of a removal defense as a factor in evaluating flight risk.[7]

_____

[7] The government's argument also ignores that in the case of a noncitizen who was properly admitted, the government bears the

- 30 -

In a final salvo, the government contends that two of our sister circuits have ruled in a manner inconsistent with our holding today. See Ali v. Brott, 770 F. App'x 298 (8th Cir. 2019); Borbot v. Warden Hudson Cnty. Corr. Facility, 906 F.3d 274 (3d Cir. 2018). We see no conflict.

To start, although Ali contains dicta that portends a different result from that reached here, the Eighth Circuit made clear that it was not reaching the constitutional question that is now before us. See 770 F. App'x at 302. Likewise, the issue presented here was not before the court in Borbot, which was a challenge based on length of detention in which the petitioner sought "to compel a second bond hearing despite alleging no constitutional defect in the one he received." 906 F.3d at 279 (second emphasis added). And although the court in Borbot stated that the petitioner had been granted "meaningful process" under section 1226(a), it made that statement in order to contrast section 1226(a) with section 1226(c), under which there is no bond hearing. Furthermore, even assuming that "meaningful process" language indicates that the Third Circuit might have viewed the procedures under section 1226(a) to be constitutionally adequate, the Third Circuit's subsequent decision in German Santos v. Warden

---

burden of proving by clear and convincing evidence that he or she is deportable. See id. § 1229a(c)(3)(A); Woodby v. Immigr. & Naturalization Serv., 385 U.S. 276, 277 (1966).

Pike Cnty. Corr. Facility, 965 F.3d 203 (3d Cir. 2020), casts doubt on the continuing validity of that view. In German Santos, the court held that the government is required to bear the burden of proving by clear and convincing evidence that a noncitizen is a danger or flight risk once detention has become unreasonably prolonged under section 1226(c). Id. at 213-14. That ruling was based on the Addington line of cases, and we struggle to see why the Third Circuit would have required those heightened protections if its statement in Borbot -- that the procedures under section 1226(a) provide "meaningful process" -- indicates that those procedures comply with due process.

In sum, the balance of the Mathews factors weighs in favor of Hernandez: "[T]he private interest affected is commanding; the risk of error from [placing the burden of proof on the noncitizen] is substantial; and the countervailing governmental interest . . . is comparatively slight." Santosky, 455 U.S. at 758.

### D.

The government urges that notwithstanding the foregoing assessment of the three Mathews factors, precedent precludes us from placing any burdens of proof on the government. First, it argues that the Supreme Court has in three cases upheld detention of noncitizens pending removal proceedings "on the basis of a

- 32 -

categorical, rather than individualized, assessment that a valid immigration purpose warranted interim custody" (emphasis in original). See Demore, 538 U.S. at 531; Carlson v. Landon, 342 U.S. 524, 538 (1952); Reno v. Flores, 507 U.S. 292, 306 (1993).

Each of these cases, however, is distinguishable from the circumstances presented here. In Demore, the Court held that section 1226(c)'s mandatory detention provision, which applies to noncitizens convicted of specified crimes and provides no opportunity for release on bond in the mine-run of such cases, does not violate due process. See 538 U.S. at 528-531; 8 U.S.C. § 1226(c); but see 538 U.S. at 532-33 (Kennedy, J., concurring) ("Were there to be an unreasonable delay by the [government] in pursuing and completing deportation proceedings, it could become necessary then to inquire whether the detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons."). The government contends that because it may detain a noncitizen without any bond hearing under section 1226(c), it follows that the bond hearing Hernandez received under section 1226(a), and the administrative review to which she was entitled, satisfies due process.

In upholding the constitutionality of section 1226(c)'s mandatory detention procedure in Demore, however, the Court

explained that that section specifically applies to a class of noncitizens who had already been convicted (beyond a reasonable doubt) of committing certain serious crimes. As to these "criminal aliens," "Congress had before it evidence suggesting that permitting [their] discretionary release . . . pending their removal hearings would lead to large numbers . . . skipping their hearings and remaining at large in the United States unlawfully." 538 U.S. at 528; see id. at 518-21 (describing studies that Congress considered showing high recidivism rates and high rates of failure to appear for removal hearings among "criminal aliens"). The Court relied on those findings in holding that section 1226(c) comports with due process, stating that "[t]he evidence Congress had before it certainly supports the approach it selected." Id. at 528.

The circumstances here are quite different. Unlike section 1226(c), section 1226(a) applies to a wide swath of noncitizens, many of whom, like Hernandez, have no criminal record at all.

The government responds that, like section 1226(c), section 1226(a) was enacted as part of IIRIRA, which was motivated by Congress's concern that "[a] chief reason why many deportable aliens are not removed from the United States is the inability of [immigration officials] to detain such aliens through the course

of their deportation proceedings." H.R. Rep. 104-469, pt. 1, at 123. As noted above, however, IIRIRA did not change section 1226(a) except by increasing the minimum bond amount from $500 to $1,500. In other words, even as Congress limited bond opportunities for noncitizens covered by section 1226(c), it chose to maintain section 1226(a)'s discretionary bond provision. And at the time Congress chose to do so, the BIA had long interpreted section 1226(a) as placing the burden of proof in bond hearings on the government. See Matter of Patel, 15 I. & N. Dec. 666 (B.I.A. 1976). So one cannot find in IIRIRA any support at all for the BIA's subsequent reversal of the burden that Congress left undisturbed.

Carlson v. Landon is also distinguishable. Carlson involved a challenge by noncitizens accused of participating in Communist activities to their detention pending a determination of removability. See 342 U.S. at 528-29. Although the individuals detained in Carlson had not been determined to be dangerous or a flight risk, the Court upheld their detention "by reference to the legislative scheme to eradicate the evils of Communist activity." Id. at 543. The purpose of that legislative scheme, the Internal Security Act, was to "deport all alien Communists as a menace to the security of the United States," id. at 541, based on Congressional findings that the "Communist organization in the

United States . . . present[s] a clear and present danger to the security of the United States," id. at 535 n.21 (quoting 50 U.S.C. § 781(15)). The Court explained that because

> all alien Communists are deportable, like Anarchists, because of Congress' understanding of their attitude toward the use of force and violence in such a constitutional democracy as ours to accomplish their political aims, evidence of membership plus personal activity in supporting and extending the [Communist] Party's philosophy concerning violence gives adequate ground for detention.

Id. at 541.

Thus, much as in Demore, Congress made specific findings as to the dangerousness of a class of noncitizens, and those findings were found to have justified the detention of noncitizens even in the absence of individualized determinations as to danger and flight risk. But for the same reasons that Demore is a poor analog to this case, so too is Carlson: no similar findings regarding dangerousness or flight risk have been made as to the class of noncitizens detained under section 1226(a). Moreover, as Hernandez points out, Carlson does not address the question of burden of proof, which was not the basis of the petitioners' challenge. Indeed, to the extent Carlson references burdens of proof, the Court explained that the Attorney General does not have "untrammeled discretion as to bail," but rather "[c]ourts review

his determination" and "he must justify his refusal of bail." Id. at 543.

Nor does Reno v. Flores control this case. Flores involved, among other things, a procedural due process challenge to a regulation that denied bail to noncitizen minors in removal proceedings who could not be released into the custody of a parent, legal guardian, or adult relative. See 507 U.S. at 297, 306-09. The relevance of Flores to this case is not immediately apparent, as the detained minors' challenge was not based on the allocation or standard for the burden of proof applicable to the custody determination. Rather, the minors' principal argument was that the immigration agency should be required to determine whether "detention . . . would better serve [their] interests than release to some other 'responsible adult,'" even if that adult was not a parent, guardian, or relative. Id. at 308.

Undeterred, the government points to the Court's statement that "due process is satisfied by giving the detained alien juveniles the right to a hearing before an immigration judge," id. at 309 (emphasis in original), and argues that because every noncitizen detained under section 1226(a) has a right to a bond hearing, due process is satisfied. The Court's statement, however, was simply a response to the lower courts' holding that the agency's "procedures are faulty because they do not provide

for _automatic_ review by an immigration judge of the initial deportability and custody determinations." _Id._ at 308 (emphasis in original). Moreover, the hearings in _Flores_ were governed by _Matter of Patel_, under which the government bore the burden of proving danger and flight risk. _Id._ at 295.

In another line of attack, the government shifts its focus back to _Demore_, arguing that the Court in that case "rejected the applicability" of _Addington_ and _Foucha_ in the context of noncitizens detained during the pendency of removal proceedings. The majority opinion in _Demore_, however, does not mention _Foucha_, _Addington_, or similar civil detention cases, despite the fact that the dissent repeatedly cites them in support of its position. We decline to read the majority's silence as to _Foucha_ and _Addington_ as an across-the-board "rejection" of their applicability in immigration detention cases. _See_ _Shalala_ v. _Ill. Council on Long Term Care, Inc._, 529 U.S. 1, 18 (2000) ("This Court does not normally overturn . . . earlier authority _sub silentio_.") _Addington_ specifically admonished that "civil commitment _for any purpose_ constitutes a significant deprivation of liberty that requires due process protections," 441 U.S. at 425 (emphasis added), and as the government itself acknowledges, _Zadvydas_, also

an immigration detention case, cites to Foucha and Salerno.[8]  See Zadvydas, 533 U.S. at 690; see also Demore, 538 U.S. at 553 (Souter, J., concurring in part and dissenting in part) ("Nowhere [in Zadvydas] did we suggest that the 'constitutionally protected liberty interest' in avoiding physical confinement, even for aliens already ordered removed, was conceptually different from the liberty interest of citizens considered in Jackson, Salerno, Foucha, and Hendricks.  On the contrary, we cited those cases and expressly adopted their reasoning, even as applied to aliens whose right to remain in the United States had already been declared forfeited.").

Despite Zadvydas's reliance on Foucha, the government next argues that Zadvydas in fact supports its position that the noncitizen seeking release, not the government, should bear the burden of proof at a section 1226(a) bond hearing.  In Zadvydas, the Court confronted the "serious constitutional problem arising out of a statute that . . . permits an indefinite, perhaps permanent, deprivation of human liberty without" sufficient procedural protection.  533 U.S. at 692.  To avoid that problem, the Court construed the statute -- which authorizes the detention

_____

[8]  Although the government attempts to distinguish Zadvydas on its facts, the differences noted by the government do not negate that Zadvydas found Foucha and Addington instructive as to due process analysis in the context of immigration detention.

of noncitizens subject to a final removal order -- to "contain an implicit 'reasonable time' limitation." Id. at 682. In order to operationalize that limitation, the Court decided that after six months of detention, "once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." Id. at 701. The government now argues that because the Court in Zadvydas put the burden in the first instance on the noncitizen seeking release, it implicitly held that placing the burden of proof on noncitizens seeking release in other contexts cannot violate due process.

This hunt for inferential support in Zadvydas overlooks the Court's express criticism of the underlying statute for putting the burden of proving dangerousness on the noncitizen. See id. at 691-92 (noting that "preventive detention based on dangerousness" must be "subject to strong procedural protections" and disapproving of the fact that under the statute "the alien bears the burden of proving he is not dangerous"). Moreover, the burden placed on the noncitizen in Zadvydas -- to "provide[] good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future," id. at 701 -- is quite different from the burden placed on a noncitizen detained under section 1226(a) to "show to the satisfaction of the Immigration

Judge that he or she" is neither dangerous nor a flight risk, Matter of Guerra, 24 I. & N. Dec. at 40. Indeed, Hernandez's case amply demonstrates the difference. Given her communal ties and lack of criminal record, it is hard to imagine she did not provide "good reason to believe" she was not dangerous or a flight risk. Yet under current BIA regulations, she could not meet the burden of showing she was not dangerous, given the Red Notice. Additionally, as the Government notes, due process "is flexible and calls for such procedural protection as the particular situation demands." Mathew v. Eldridge, 424 U.S. at 334. There is no indication that the Supreme Court intended Zadvydas's burden allocation procedures for individuals already subject to a final order of removal to apply in the context of detention pending a determination of removability under section 1226(a). Cf. Johnson v. Guzman Chavez, 141 S. Ct. 2271, 2290 (2021) (contrasting noncitizens detained prior to having been ordered removed with those held after having been ordered removed; noting that noncitizens "who have not been ordered removed are less likely to abscond because they have a chance of being found admissible, but [those] who have already been ordered removed are generally inadmissible").

The government also points to language in the Jennings dissent which it contends approves of the existing procedures under

section 1226(a).  See 138 S. Ct. at 882 (Breyer, J., dissenting).  But the issue currently before us was not squarely before the Court in Jennings.  Likewise, the Court was not presented with this issue in Preap.  Regardless, the Court's statement in Preap that a noncitizen detained under section 1226(a) "may secure his release if he can convince the officer or immigration judge that he poses no flight risk and no danger to the community," 139 S. Ct. at 960, was merely a description of the agency's regulations.

The government similarly contends that two district court decisions in our circuit approved of the procedures governing section 1226(a) bond proceedings "as a remedy" for those detained under section 1226(c).  See Reid v. Donelan, 22 F. Supp. 3d 84, 93 (D. Mass. 2014), vacated and remanded on other grounds, 819 F.3d 486 (1st Cir. 2016), opinion withdrawn, No. 14-1270, 2018 WL 4000993 (1st Cir. May 11, 2018); Gordon v. Johnson, 300 F.R.D. 31, 41 (D. Mass. 2014), vacated sub nom. Gordon v. Lynch, 842 F.3d 66 (1st Cir. 2016)  But those decisions were both based on the idea that "individuals who committed a § 1226(c) predicate offense should not receive more protections than § 1226(a) detainees." Reid, 22 F. Supp. 3d at 92 (emphasis in original); see Gordon, 300 F.R.D. at 42 (noting additionally that the court "has its concerns about the procedures used to effectuate the requirements of § 1226(a)").  The government's reliance on Castaneda v. Souza, 810

F.3d 15 (1st Cir. 2015) (en banc) is likewise unavailing.  There is no indication that the petitioner, who was detained under section 1226(c), sought bond procedures beyond those provided in section 1226(a); rather, she challenged ICE's determination that she was subject to mandatory detention under section 1226(c).

Leaving no stone unturned, the government lastly points to a district court opinion which it claims held contrary to our conclusion here.  See Maldonado-Velasquez v. Moniz, 274 F. Supp. 3d 11, 14-15 (D. Mass. 2017).  But, beyond venturing a "guess," the district court did not decide the due process issue.  Id. at 15.  Instead, it assumed arguendo that the burden had been misallocated but concluded that the petitioner could not show any prejudice flowing from that error.  Id. at 13-14.  We dismissed the petitioner's appeal as moot.  Maldonado-Velasquez v. Moniz, No. 17-1918 (1st Cir. March 22, 2018).  And although we stated that the petitioner's "due process claim is not compelling," it is clear, as the government itself notes, that we were referring to the petitioner's inability to show prejudice.  Id. at n.2.

For all of the foregoing reasons, we remain unconvinced by the government's contention that we should not view an analysis of the Matthews factors as ultimately controlling.  We therefore conclude that the government must bear the burden of proving

- 43 -

dangerousness or flight risk in order to continue detaining a noncitizen under section 1226(a).

## E.

Having decided that the government bears the burden of proof, we now turn to the extent of that burden. "[T]he function of legal process is to minimize the risk of erroneous decisions," Addington, 441 U.S. at 425, and the standard of proof "serves to allocate the risk of error between the litigants," id. at 423. In detention cases, applying a heightened "standard of proof . . . reflects the value society places on individual liberty," id. at 425 (quoting Tippett v. Maryland, 436 F.2d 1153, 1166 (4th Cir. 1971)(Soboloff, J., concurring in part and dissenting in part), and avoids the risk associated with the preponderance standard of "increasing the number of individuals erroneously committed," id. at 426 (noting "it is at least unclear to what extent, if any, the state's interests are furthered by using a preponderance standard"). See also id. at 423 (explaining that, in contrast to cases in which liberty from detention is at issue, in "monetary dispute[s] between private parties . . . society has a minimal concern with the outcome . . . [and so] plaintiff's burden of proof is a mere preponderance of the evidence").

Therefore, in several contexts, the government must justify detention by clear and convincing evidence. See, e.g.,

Addington, 441 U.S. at 433 (involuntary civil commitment to mental hospital); Foucha, 504 U.S. at 86 (confinement of insanity acquittees).  Other significant liberty interests are similarly protected:  The government must satisfy the clear and convincing standard in order to terminate parental rights, see Santosky, 455 U.S. at 748, deport a noncitizen, see Woodby v. Immigr. & Naturalization Serv., 385 U.S. 276, 277 (1966), or denaturalize an individual, see Chaunt v. United States, 364 U.S. 350, 353 (1960).

As to the government's burden to prove that a noncitizen presents a danger, we see no reason to vary from that approach: For the reasons described above, there is a heightened risk of prejudicial error and the government has ample and better access to evidence of dangerousness.  See supra Section III.B.[9]

But with respect to flight risk, the second Mathews factor leads us to conclude that the government need only carry its burden by a preponderance of the evidence.  Simply put, there is less risk of error from a preponderance standard on this issue because, as noted, detained citizens possess knowledge of many of the most relevant factors, such as their family and community ties,

---

[9] The government's argument that the Supreme Court has not required the government to meet a clear and convincing standard to justify the detention of noncitizens is unavailing.  In short, none of the cases cited by the government presented the question of what standard the government would have to meet to justify the detention of a noncitizen.  Those cases therefore offer limited guidance on that issue, let alone binding precedent.

place of residence, length of time in the United States, and record of employment. And because the burden is on the government, the noncitizen need not prove a negative (by showing, for example, that he or she has not fled prosecution or failed to appear at court) but is instead faced with the more straightforward task of marshalling evidence readily available to her so as to rebut the government's evidence. Given these considerations, the probable value of a heightened standard of proof is thus less apparent when it comes to flight risk.

Two other considerations underlie our decision. First, a noncitizen's flight risk (as opposed to his or her danger) has a close nexus to the government's interest in ensuring the prompt execution of deportation orders. Second, although the Court has consistently required a clear and convincing standard when the government seeks to detain on the basis of danger, most of those cases do not involve risk of flight. In the analogous context of pretrial criminal detention under the Bail Reform Act, where flight risk is a factor, the government need only prove flight risk by a preponderance of the evidence in order to continue detention. See United States v. Patriarca, 948 F.2d 789, 793 (1st Cir. 1991).

Of course, the analogy to criminal pretrial detention has its limits. Criminal defendants, for example, have a right to government-appointed counsel, 18 U.S.C. § 3142(f), while

section 1226(a) detainees do not, 8 U.S.C. § 1362. But those differences cut both ways: While they suggest the section 1226(a) detainee may have fewer resources with which to marshal evidence and argument, they also suggest that the government traditionally encounters more hurdles in criminal rather than civil proceedings. Cf. Immigr.& Naturalization Serv. v. Lopez-Mendoza, 468 U.S. 1032, 1038 (1984) (noting the civil nature of deportation proceedings and explaining that "various protections that apply in the context of a criminal trial do not apply in a deportation hearing"). And although the Speedy Trial Act, 18 U.S.C. § 3161, limits the duration of pretrial detention, the average criminal defendant can expect to be detained for a significant period of time. See Amaryllis Austin, The Presumption for Detention Statute's Relationship to Release Rates, 81 Fed. Prob. J. 52, 53 (2017) (Noting that, as of 2016, "the average period of detention for a pretrial defendant had reached 255 days" and in "several districts [the] average [was] over 400 days"). All in all, as to the government's burden to prove flight risk in a section 1226(a) bond hearing, we conclude that the preponderance standard balances the competing interests as fairly as it does in a criminal bail hearing.

In sum, we hold that, in order to continue detaining Hernandez under section 1226(a), due process requires the

government to either (1) prove by clear and convincing evidence that she poses a danger to the community or (2) prove by a preponderance of the evidence that she poses a flight risk.

**IV.**

We consider, next, the question of prejudice. Normally "[w]hen faced with a constitutional due process claim in the immigration context, we ask whether the procedure at issue 'is likely to have affected the outcome of the proceedings' as a condition of relief." Hernandez Lara, 962 F.3d at 57 (quoting Pulisir v. Mukasey, 524 F.3d 302, 311 (1st Cir. 2008)); see also Lopez-Reyes v. Gonzales, 496 F.3d 20, 23 (1st Cir. 2007) ("Absent cognizable prejudice, there is no due process claim.") Although Hernandez argues that "a misallocated burden of proof is a structural error [that] constitutes a per se prejudice," we need not reach that argument. As the IJ observed, the reallocation of the burden of proof ordered by the district court proved pivotal in changing the result from detention to release. Nor has the government challenged the district court's finding that Hernandez was prejudiced. Cf. Hernandez Lara, 962 F.3d at 56-57 (noting a circuit split on "whether a petitioner who was improperly denied counsel in immigration proceedings must demonstrate that the denial resulted in prejudice" but declining to decide the question given that the petitioner was clearly prejudiced).

- 48 -

**V.**

Before concluding, we address three arguments made by the dissent in support of its claim that our decision amounts to "judicial hubris."

**A.**

The dissent contends first that we should grant Hernandez relief on a statutory basis, rather than on constitutional grounds. The relief proposed by the dissent under the Administrative Procedures Act (APA) is a declaration that enforcing the BIA's current allocation of the burden of proof is unlawful because the BIA acted in an arbitrary and capricious manner when it placed the burden of proof in bond hearings on noncitizens. The dissent would then vacate the district court's current injunction and judgment and remand for the district court to determine the "scope of any injunctive relief." The scope of that injunctive relief, however, would necessarily be limited to enjoining the enforcement of the BIA's current arbitrary and capricious bond procedures, which would leave in place the prior procedures. Though those procedures placed the burden of proof on the government, they did not require the government to bear that burden by clear and convincing evidence. See Matter of Patel, 15 I. & N. Dec. at 666 ("An alien generally is not and should not be detained or required to post bond except on a finding that he is

a threat to the national security or that he is a poor bail risk."
(citations omitted).[10]

Hernandez, though, asks not just that the burden of proof be allocated to the government. She claims that the constitution requires the government to carry that burden by clear and convincing evidence. The district court agreed; the IJ then applied the clear and convincing standard; Hernandez was set free; and the government now appeals, asking us to rule that Hernandez was not entitled to a clear and convincing standard as to danger or flight risk. So resolving this action by deciding the APA claim developed by the dissent in Hernandez's favor, as the dissent proposes, would deny by neglect a central aspect of the relief sought by Hernandez under her constitutional claim.[11] Ruling as the dissent proposes would also require that we more broadly vacate the relief ordered by the district court, and allow for a new

---

[10] The dissent asserts that the BIA has not addressed the quantum of proof. Not so: As explained above, the BIA has required a noncitizen to prove "to the satisfaction of the Immigration Judge that he or she merits release on bond." Matter of Guerra, 24 I. & N. Dec. at 40.

[11] For this reason, the dissent's charge that we have ordered relief that is "more burdensome" than "necessary to provide complete relief" falls flat. Madsen v. Women's Health Ctr., Inc., 512 U.S. 753, 765 (1994) (quoting Califano v. Yamasaki, 442 U.S. 682, 702 (1979)). Whether or not the relief goes beyond that necessary to decide the APA claim, the crucial point is that it is no way more burdensome than necessary to accord "complete relief" as to Hernandez's constitutional claim. Id.

hearing not just on flight risk, but on dangerousness as well.  In short, what the dissent proposes is not constitutional avoidance, which entails finding an alternative basis for providing the relief sought under the constitutional claim.  See Marasco & Nesselbush, LLP v. Collins, No. 20-1397, 2021 WL 3012705, at *18 (1st Cir. July 16, 2021) (declining to address due process claim under doctrine of constitutional avoidance because "the relief available under the [statutory ground] adequately addresse[d] [the plaintiff's] remedial requests" and so "a non-constitutional disposition [was] possible").  Rather, the dissent proposes that we simply shirk our duty to decide a properly raised claim upon which a substantial portion of the request for relief hinges.

**B.**

The dissent also contends that our decision infringes on the province of the political branches.  That general accusation can be made in every case involving an administrative rule or congressional statute, including every due process case.  Clearly, the fact that another branch has acted in an area is an insufficient reason to refrain from exercising our "duty . . . to say what the law is," Marbury v. Madison, 5 U.S. 137, 177 (1803), even in immigration and detention cases, and even where doing so requires setting aside Congressional enactments, executive actions, or state statutes.  See, e.g., Zadvydas, 533 U.S. at 695

- 51 -

(explaining that, despite Congress's "'plenary power' to create immigration law, . . . Executive and Legislative Branch decisionmaking in that area . . . is subject to important constitutional limitations"; construing immigration detention statute to avoid unconstitutional detention); Hamdi v. Rumsfeld, 542 U.S. 507, 536-37 (2004) (holding that even "in the context of military action, it would turn our system of checks and balances on its head to suggest that a citizen could not make his way to court with a challenge to the factual basis for his detention by his Government, simply because the Executive opposes making available such a challenge"); Foucha, 504 U.S. at 81-82 (striking down Louisiana statute under which "the State need prove nothing to justify continued detention" of insanity acquittees).

As these and many other cases make clear, ours is a system in which even the most sensitive and critical exercises of power by the political branches can be constrained by the rights of the individual. In few instances are those constraints more necessary than when the government seeks to lock up individuals behind bars. Addington, 441 U.S. at 425 ("[C]ivil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protections."). And it is precisely the role of the judiciary to define those constraints. Far from violating the separation of powers, exercising that role is integral to

fulfilling the vision of the "Framers of the Constitution that, within our political scheme, the separation of governmental powers into three coordinate Branches is essential to the preservation of liberty." Mistretta v. United States, 488 U.S. 361, 380 (1989).

We are mindful that immigration is "interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government." Demore, 538 U.S. at 522. But nothing in our opinion today prevents the political branches from detaining noncitizens where necessary, let alone from exercising the power to exclude or expel noncitizens. Moreover, even where war and foreign relations are at issue, the Constitution "most assuredly envisions a role for all three branches when individual liberties are at stake." Hamdi, 542 U.S. at 536; see also Zadvydas, 533 U.S. at 695. And as we explained above, the Court has consistently held that due process "applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." Zadvydas, 533 U.S. at 693. Though we hope and expect that the political branches exercise their authority in harmony with the rights of noncitizens, history and common sense teach that rights are most likely to be disregarded when they belong to those who cannot vote. Cf. United States v. Carolene Prod. Co., 304 U.S. 144, 153 n.4 (1938) (noting

that "prejudice against discrete and insular minorities may be a special condition, which tends seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities").

We stress as well that nothing in our decision restricts the political branches from implementing more nuanced rules for the adjudication of requests for release under section 1226. All that is required is that those rules comport with the minimum standards of the constitution. Cf. Addington, 441 U.S. at 431 ("As the substantive standards for civil commitment may vary from state to state, procedures must be allowed to vary so long as they meet the constitutional minimum."). The dissent speculates that complying with those minimum standards will impose additional burdens on an overtaxed immigration system. But as we have explained, avoiding needless detention may well reduce the burden of enforcing immigration laws, particularly since, as the dissent concedes, the vast majority of noncitizens released from detention (like Hernandez) appear at their removal hearings.

## c.

Finally, the dissent contends that our decision is overly broad because the current bond procedures are constitutional in at least some cases, dooming a facial challenge to those procedures. To this contention we offer two responses.

First, and most simply, Hernandez claims that the current BIA standard of proof as applied in her case caused her to be unconstitutionally detained.  And the IJ found the standard was indeed pivotal.  So whatever one might say about facial challenges generally poses no bar to granting Hernandez relief.

Second, the dissent's reasoning seems flawed, even circular.  The logic of the dissent appears to be that if there is sufficient evidence of flight risk in a particular case (e.g., per the dissent, fleeing from a checkpoint) the government need not carry the burden of proving flight risk in that particular case.  But "the right to procedural due process . . . does not depend upon the merits of a claimant's substantive assertions." Carey v. Piphus, 435 U.S. 247, 266 (1978). Moreover, the dissent's argument begs the question:  What burden and standard would apply in determining whether the merits of the request for release are sufficient to obviate the need for placing the burden on the government?  The dissent does not say.  If the burden is as we suggest it should be, then the dissent's approach simply front ends the application of that requirement.  And if it is a lesser burden, then the dissent's approach is simply a round-about way of saying that there should be a lesser burden.

Given all of the above, it is unsurprising that the Supreme Court has consistently decided procedural due process

challenges in the detention context on a categorical basis (e.g., all criminal defendants or insanity acquittees). See, e.g., In re Winship, 397 U.S. 358, 364 (1970) (holding due process requires that all criminal defendants must be convicted by proof beyond a reasonable doubt); Hamdi, 542 U.S. at 533-35 (setting forth the contours of the procedures required under due process for all "citizen-detainee[s] seeking to challenge [their] classification as an enemy combatant"); Addington, 441 U.S. at 433 (holding that "the individual's interest in the outcome of a civil commitment proceeding is of such weight and gravity that due process requires the state to justify confinement by proof more substantial than a mere preponderance of the evidence"); Foucha, 504 U.S. at 86 (holding broadly that insanity acquittees may not be detained unless the government can show they are dangerous by clear and convincing evidence).

In none of these cases did the Court limit its holding to the specific individual before it or indicate that the requirements of due process would fluctuate based on the strength of any particular individual's case on the merits.[12] Cf. Addington,

_____

[12] Similarly, in a variety of other contexts, the Court has announced due process rules for entire categories of claimants, despite variations within those classes. See, e.g., Goldberg v. Kelly, 397 U.S. 254, 260, 270 (holding that all "welfare recipients" must be afforded an "evidentiary hearing before the termination of benefits" at which they must be "given an

441 U.S. at 425 (noting that "even if the particular standard-of-proof catchwords do not always make a great difference in a particular case, adopting a 'standard of proof is more than an empty semantic exercise'" because the standard of proof "reflects the value society places on individual liberty" (quoting Tippett, 436 F.2d, at 1166)). So too, here: The category consists of persons detained under section 1226(a) (i.e., those who have not been convicted already of the crimes calling for detention under section 1226(c)); and the fact that any given section 1226(a) detainee may have a more or less compelling case for release will bear on the outcome of the hearing but does not alter the minimum procedures required by due process in a bond hearing.

Nor did such cases vary the requirements of due process for different "subcategories" of detainees, e.g., those with certain types of mental illness or those who have committed certain types of crimes. Similarly, cases outside of the detention context

opportunity to confront and cross-examine" witnesses relied upon by the government); Vitek v. Jones (Setting forth minimal due process requirements for all "prisoners facing involuntary transfer to a mental hospital"; holding due process requires all such prisoners receive "qualified and independent assistance" regardless of the individual's mental illness or other circumstances); Woodby, 385 U.S. at 285-86 (broadly holding that the government must prove grounds for deportation "by clear, unequivocal, and convincing evidence"); Chaunt, 364 U.S. at 353 (broadly holding that the government must prove grounds for denaturalization by "clear, unequivocal, and convincing evidence").

do not slice and dice claimants (such as welfare recipients) into some unknown number of unspecified subcategories.

We are far from alone in applying procedural due process protections to well-defined categories of noncitizens (e.g., section 1226(a) detainees), rather than developing bespoke procedures that would vary in their application from case to case or subcategory to subcategory depending on the very factor that the procedures are designed to assess. See, e.g., Hernandez, 872 F.3d at 990-91 (holding that IJs must consider a noncitizen's financial circumstances and alternative conditions of release during section 1226(a) bond hearings); Singh, 638 F.3d at 1203-04 (holding that "the government must prove by clear and convincing evidence that an alien is a flight risk or a danger to the community to justify denial of bond at a Casas hearing"); cf. Zadvydas, 533 U.S. at 701 (holding that once a noncitizen detained following a final removal order has been held for six months, the noncitizen may challenge his continued detention).

Recognizing well-defined categorical rules in procedural due process cases is unsurprising from the standpoint of judicial and administrative efficiency. Otherwise, every controversy would become two cases in one: a determination of the procedures required by due process, followed by a resolution of the merits. For detention pending the completion of removal proceedings, that

inefficiency would be exacerbated because each case begins in an administrative proceeding, while habeas claims are heard in the district courts.

For all of these reasons, we decline the dissent's invitation to gum up the adjudication of immigration bond proceedings by requiring a case-by-case determination of the burden of proof.

## VI.

For the foregoing reasons, we <u>affirm</u> in part, <u>reverse</u> in part, and <u>remand</u> to the district court with instructions to allow the government, should it wish to do so, to conduct a new hearing before the Immigration Judge at which, in order to reinstitute Hernandez's detention, the government will need to prove flight risk by a preponderance of the evidence.

**- Dissenting Opinion Follows -**

**LYNCH**, **Circuit Judge**, **dissenting**.  With respect, I cannot join the majority opinion, which is at odds with binding Supreme Court case law and creates circuit splits.  First, the majority gives a backhand to the basic principle of constitutional avoidance and violates basic separation of powers principles.  Second, if that were not enough, the majority's due process analysis is simply wrong and contrary to controlling law.

It is a "cardinal principle of judicial restraint," that "if it is not necessary to decide more, it is necessary not to decide more."  PDK Lab'ys Inc. v. DEA, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and dissenting in part).  That principle is never more important than when we can resolve a case on statutory grounds to avoid reaching a constitutional question.  See, e.g., Ashwander v. TVA, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring).  And our obligation to avoid a constitutional judgment becomes even stronger when doing so allows us to return decisions to politically accountable actors.  Cf. Quill v. Vacco, 80 F.3d 716, 738-40 (2d Cir. 1996) (Calabresi, J., concurring in the judgment) (articulating theory of "constitutional remand").

In these related cases challenging the Board of Immigration Appeal's ("BIA") allocation of burdens in discretionary immigration bond proceedings to detained noncitizens

facing removal[13] ("noncitizens" or "detainees") in its 1999 decision In re Adeniji, 22 I. & N. Dec. 1102, 1113 (B.I.A. 1999) (en banc), which still controls today, the asserted violations of the Administrative Procedure Act ("APA") must be addressed first and, in my view, entitle the plaintiffs to relief, albeit different relief. That should be the start and end of our inquiry.

I also dissent because the majority's due process holding is, in my view, quite wrong on the merits. No court should needlessly constitutionalize a rule that is better left to the executive and the Congress, which are, after all, responsive to the voters.

**I.**

We heard argument on the same day in three cases challenging the BIA's Adeniji decision, allocating the burdens of production and persuasion in discretionary immigration bond proceedings: this case; Doe v. Tompkins, No. 19-1368; and Pereira-Brito v. Garland, Nos. 20-1037 and 20-1119. In both Doe and Pereira-Brito, the plaintiffs pleaded their detention under Adeniji was illegal

---

[13] While most detainees are undocumented noncitizens, a smaller number are lawfully present persons who are subject to removal because, for example, they have committed certain crimes, have engaged in fraud, or threaten national security. 8 U.S.C. § 1227.

because Adeniji was in violation of the APA.[14]  I would resolve these cases on APA grounds.  By its choice as to the order of the cases it addresses, the majority has attempted to avoid discussion of the key argument underlying all of this litigation.  The analysis should have started with Pereira-Brito and Doe under the principles of constitutional avoidance.

Those APA arguments are properly before us.  Though the courts below did not reach those arguments and though the plaintiffs have not pressed them robustly before us, we may decide a case on any grounds supported by the record.  Steinke v. Sungard Fin. Sys., Inc., 121 F.3d 763, 768 (1st Cir. 1997).  When we can avoid a constitutional question, we must turn to such other grounds even when the litigants lead with their constitutional claims.  See Greenless v. Almond, 277 F.3d 601, 605-07 (1st Cir. 2002).  Indeed, the Supreme Court has often endorsed a more lenient approach to ordinary waiver rules when that approach allows the Court to avoid thorny constitutional questions.  See, e.g., Reno v. Flores, 507 U.S. 292, 300 n.3 (1993); Alma Motor Co. v. Timken-Detroit Axle Co., 329 U.S. 129, 142 (1946).

---

[14] The Department of Justice has not been asked to directly respond to this argument in this court, as it would be if the constitutionality of a statute were at stake.  Accordingly, I rely on the briefs it filed below.

Were the Court to resolve Pereira-Brito and Doe as I propose, it would be appropriate to vacate the injunction and judgment and remand to the district court for further proceedings.

**II.**

Having established that the APA questions are properly before us, I turn to the regulatory and statutory context for the APA challenge.

Congress has long authorized the Attorney General to detain noncitizens in deportation proceedings.[15]  For most of the twentieth century, the relevant statutes vested the Attorney General with discretion to detain, release on bond, or conditionally parole such noncitizens.  Pub. L. No. 414, § 242(a), 66 Stat. 208, 208-09 (1952); Pub. L. No. 831, § 23(a), 64 Stat. 1010, 1011 (1950).  Neither those statues nor their implementing regulations defined who bore the burden of proof in bond proceedings.  See id.; Authority to Issue and Cancel Orders to Show Cause; Authority to Issue Warrants of Arrest, 39 Fed. Reg. 20,367 (June 10, 1974) (codified at 8 C.F.R. § 242); Orders to Show Cause and Warrants of Arrest, 28 Fed. Reg. 8,279, 8,280 (Aug. 13, 1963) (codified at 8 C.F.R. § 242).  Instead, the BIA required the government to prove that a noncitizen in removal proceeding

---

[15] Congress later transferred that authority to the Secretary of Homeland Security.  6 U.S.C. § 251.

should be detained, applying a presumption in favor of liberty that could be overcome by a showing that he posed a "threat to national security" or was a "poor bail risk." Matter of Patel, 15 I. & N. Dec. 666, 666 (B.I.A. 1976).

In 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), which categorically denied bond to noncitizens in deportation proceedings who have been convicted of aggravated felonies and certain other offenses. Pub. L. No. 104-208, § 303(a), 110 Stat 3009 (codified at 8 U.S.C. § 1226(c)). Because that change required the government to increase its detention capacity, Congress provided for a two-year transition period, during which the Attorney General had some discretion to release criminal noncitizens. IIRIRA § 303(b) (codified at note to 8 U.S.C. § 1226).

To implement IIRIRA during and after the transition period, the Immigration and Naturalization Service ("INS") adopted a series of regulations.[16] Naturalization Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10312 (Mar. 6, 1997). As relevant here, those regulations provide that:

> Any officer authorized to issue a warrant of
> arrest [(i.e., immigration officials but not

---

[16] The INS's immigration enforcement functions were later transferred to the Bureau of Immigration and Customs Enforcement ("ICE"). 6 U.S.C. §§ 251, 291(a).

immigration judges)] may, in the officer's discretion, release [a noncitizen] not described in section 236(c)(1) of the Act [(a criminal noncitizen)], under the conditions at section 236(a)(2) [(permitting bond or parole)] and (3) [(prohibiting work authorization)] of the Act; provided that the [noncitizen] must demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the [noncitizen] is likely to appear for any future proceeding.

8 C.F.R. § 236.1(c)(8); accord id. § 1236.1(c)(8). In proposing the rule concerning immigration officials other than immigration judges ("IJs"), the INS said that, other than changes to the amount of minimum bond amount, for non-criminal noncitizens "the proposed rule essentially preserves the status quo for bond determination by the [INS] and bond redetermination proceedings before immigration judges." Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 444, 450 (Jan. 3, 1997).

Despite this assertion of purported continuity, the final rule changed the presumption of release before immigration officials. In adopting the rule, the INS briefly explained the change relying heavily on a report from the Inspector General of the Department of Justice:

Several commenters stated that § 236 of the proposed rule as written is a reversal of long established procedure that provides that a noncriminal [noncitizen] is presumptively eligible for release. The Service has been

- 65 -

> strongly criticized for its failure to remove [noncitizens] who are not detained. A recent report by the Department of Justice Inspector General shows that when [noncitizens] are released from custody, nearly 90 percent abscond and are not removed from the United States. The mandate of Congress, as evidenced by budget enhancements and other legislation, is increased detention to ensure removal. Accordingly, because the Service believes that the regulation as written is consistent with the intent of Congress, the interim rule has not modified the proposed rule in this regard.

62 Fed. Reg at 10,323 (citing Dep't of Justice, Off. Inspector General, Rep. No. I-96-03, Immigration and Naturalization Service Deportation of Aliens After Final Orders Have Been Issued (1996) ("OIG Report"), https://oig.justice.gov/reports/INS/e9603/index.htm). Two points are notable here. First, the Inspector General's report was concerned with noncitizens subject to a final order of removal, not the relevant category for § 1226(a) -- noncitizens contesting their removability. Second, the INS did not explain that Congress had to increase the detention budget to fund IIRIRA's new mandatory detention scheme. See Matter of Garvin-Noble, 21 I. & N. Dec. 672, 675 (B.I.A. 1997) ("In enacting the Transition Period Custody Rules, Congress had before it evidence that the Attorney General did not have sufficient resources to carry out the mandatory detention requirement recently implemented . . . ."); see also TVA v. Hill, 437 U.S. 153, 190 (1978) (holding that budget appropriations cannot alter meaning of statute).

The regulations also provide for IJ review of initial bond determinations:

> After an initial custody determination by the district director, including the setting of a bond, the respondent may, at any time before an order [of removal] becomes final, request amelioration of the conditions under which he or she may be released. Prior to such final order, and except as otherwise provided in this chapter, the [IJ] is authorized to exercise the authority in [8 U.S.C. § 1226] to detain the [noncitizen] in custody, release the [noncitizen], and determine the amount of bond, if any, under which the respondent may be released, as provided in § 3.19 of this chapter [(procedural rules)].

8 C.F.R. § 236.1(d)(1); accord id. § 1236.1(d)(1).

Following adoption of those regulations, the BIA abrogated Patel and stated -- not in a regulation but only in a reported decision in a single case -- that "for ordinary bond determinations [before IJs] under [§ 1226(a)] . . . [a noncitizen] must demonstrate that 'release would not pose a danger to property or persons.'" Adeniji, 22 I. & N. Dec. at 1113.

The BIA tried to justify its departure from Patel by relying on the new regulation, which did not concern IJs, and stated that the regulation required it to shift the burden of proof in detention proceedings before IJs. Id. at 1103, 1113. After determining that the regulations applied both during and after the transition period, id. at 1107-1112, the BIA held that:

> [f]rom the outset . . . the regulations under
> the IIRIRA have added as a requirement for
> ordinary bond determinations under section
> 236(a) of the Act that the [noncitizen] must
> demonstrate that "release would not pose a
> danger to property or persons," even though
> section 236(a) does not explicitly contain
> such a requirement. . . . We deem the
> regulatory provision at 8 C.F.R. § 236.1(c)(8)
> to contain the appropriate test, as it is
> binding on us and pertains directly to removal
> proceedings under the IIRIRA. Consequently,
> to be eligible for bond, the respondent must
> demonstrate that his "release would not pose
> a danger to property or persons, and that (he)
> is likely to appear for any future
> proceeding."

Id. at 1113 (citation omitted).

### III.

An agency's decision is arbitrary or capricious when it overlooks relevant issues or when it fails to "articulate a satisfactory explanation for its action." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). When an agency changes an established policy, it must show that "the new policy is permissible under the [relevant] statute, that there are good reasons for it, and that the agency believes it to be better." FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009).

In my view, the Adeniji decision by the BIA is arbitrary and capricious. It rests on at least two erroneous and unreasoned

administrative leaps.  Further, I conclude the present regime is likely contrary to Congressional intent.

### A.

The only reason the BIA offered for its departure from Patel was that 8 C.F.R. § 236.1(c)(8) compelled its holding.  That interpretation was erroneous.[17]

The text of 8 C.F.R. § 236.1(c)(8), which Adeniji relies on, does not apply to immigration judges.  It sets bond standards to be used by "officer[s] authorized to issue a warrant of arrest." 8 C.F.R. § 236.1(c)(8).  Those officers include a wide range of immigration field officers and some other officials, but do not include IJs.  See id. § 287.5(e)(2).  On its face, the regulation governs only arresting officers not IJs.  That makes sense as the

---

[17] The BIA is not entitled to deference to its interpretation of the regulation.  The Court does not owe Auer deference to the BIA's interpretation of another agency's regulation.  See Nat'l Treasury Emps. Union v. Fed. Lab. Rels. Auth., 942 F.3d 1154, 1156 (D.C. Cir. 2019).  At most, it owes the BIA "some deference." Beltrand-Alas v. Holder, 689 F.3d 90, 92 (1st Cir. 2012) (quoting McKenzie-Francisco v. Holder, 662 F.3d 584, 586 (1st Cir. 2011); but see Kisor v. Wilkie, 139 S. Ct. 2400, 2417 (2019) (emphasizing that the "basis for deference ebbs" when the regulation "'fall[s] within the scope of another agency's authority.'" (alteration in original) (quoting City of Arlington v. FCC, 569 U.S. 290, 309 (2013) (Breyer, J., concurring in part))).  And when, as here, the text and structure of the regulation precludes the agency's interpretation, no deference is warranted.  See Kisor, 139 S. Ct. 2415.  Finally, the government did not argue for deference to the BIA's regulatory interpretation, and the Court need not consider deferring unless the government asks us to do so.  HollyFrontier Cheyenne Ref., LLC v. Renewable Fuels Ass'n, 141 S. Ct. 2172, 2180 (2021).

two are in very different positions. Arresting officers have limited knowledge and should be inclined to err on the side of caution. IJs in bond hearings have much more knowledge and the benefit of arguments from both sides. Thus, the text does not support the BIA's conclusion that it must supply the standard for bond hearings.

Indeed, the regulation which actually governs bond proceedings before IJs is different. 8 C.F.R. § 236.1(c)(8) states that "[a]fter an initial custody determination" under 8 C.F.R. § 236.1(c)(8), a detainee may "request amelioration of the conditions under which he or she may be released." In allowing IJs to ameliorate -- or improve -- bond conditions, the regulation necessarily states that IJs may deviate from the standards governing arresting officers. See ameliorate, The American Heritage Dictionary of the English Language 59 (3d ed. 1996) ("To make or become better; to improve."); accord ameliorate, Webster's New World Dictionary 43 (3d college ed. 1988).

The regulation also is different in its description of the discretion IJs have in setting bond conditions. It authorizes IJs "to exercise the authority in [8 U.S.C. § 1226(a)] . . . to detain the [noncitizen] in custody, release the [noncitizen], and determine the amount of bond, if any, under which the respondent may be released." 8 C.F.R. § 236(d)(1) (emphasis added). The

- 70 -

regulation thus delegates the Attorney General's broad discretion to set bond conditions. And it expressly delegates all of the Attorney General's authority. Cf. Seila L. LLC v. CFPB, 140 S. Ct. 2183, 2191 (2020) (holding that the Executive Vesting Clause, which vests "the Executive Power" confers "all of" the executive power (emphasis added)). That wholesale delegation contrasts with the conditional delegation provided to other immigration officials in 8 C.F.R. § 236.1(c)(8). The BIA recognized that the INS conferred different authority on IJs in bond hearings than on arresting officers. Adeniji, 22 I. & N. Dec. at 1112. The BIA's inconsistent treatment between the regulations governing IJs and arresting officers wipes away those differences and renders as mere surplusage the delegation to IJs of all of the Attorney General's authority. The BIA's reasoning in Adeniji that the regulation mandates its atextual reading is itself a violation of the APA.

Our review is limited to reviewing the grounds the BIA offered for departing from Patel. SEC v. Chenery Corp., 318 U.S. 80, 94 (1943). The only grounds the BIA offered in Adeniji was that 8 C.F.R. § 236.1(c)(8) mandated its outcome. As I have shown, that is simply not so. The BIA's decision in Adeniji was arbitrary or capricious, and its continued imposition of the burden of proof on noncitizens is thus unlawful.

Not only did the BIA misinterpret 8 C.F.R. § 236.1(c)(8), but the INS also acted arbitrarily and capriciously when it adopted the regulation for two additional reasons.

First, in adopting the regulation, the INS "entirely failed to consider an important aspect of the problem." State Farm, 463 U.S. at 43. A key aspect of any detention regime is the relative dangerousness and flight risk of different classes of detainees. See, e.g., 18 U.S.C. § 3142(f)(1) (limiting pretrial detention to criminal defendants charged with certain offenses), (e)(2)-(3) (imposing rebuttable presumption of detention only for certain recidivist defendants or defendants charged with certain serious offenses). In my view Congress intended to continue the customary view that detention authorizations must be carefully limited. See United States v. Salerno, 481 U.S. 739, 755 (1987). Indeed, Congress embraced that logic in the very statute at issue, mandating detention for certain criminal noncitizens and allowing all other detainees the opportunity for bond. 8 U.S.C. § 1226(a), (c); see Maj. Op. 25. Nothing in the record suggests that the INS considered the relative risks of different classes of detainees. There are different classes of such detainees, including, for example, those with no criminal records, to those with nonserious

misdemeanor offenses, to those who have committed felonies some of a serious nature, but not aggravated felonies.

A few examples from these cases illustrate the wide range of risk different noncitizens pose. Doe was picked up after two serious criminal charges: carrying a weapon-sized knife and assault and battery. He did not even apply for asylum until after he requested a bond hearing, though he had three years to do so before his arrest.[18] And while Hernández-Lara had not committed criminal offenses in the United States, an Interpol red notice said that she had done so in El Salvador and was a member of the Pandilla 18 street gang. If the IJ erred in initially denying bail based on that information, Hernández-Lara had an administrative appeal available to her, which the majority's opinion has pretermitted and necessarily concluded is inadequate under the Due Process Clause. On the other side of the scale, perhaps detainees who are veterans of the U.S. armed forces, and about whom the government consequently has more information, are themselves a special class.

Nor does the record reflect that the INS considered relative risk or burden as to several distinct categories of noncitizen as for which discretionary detention is authorized.

---

[18] Indeed, his lead claim in his petition was about the policy of the sheriff's department not to provide transportation to the hearings on his criminal charges in the local courts.

The INS should have at least considered whether it was grouping like and unlike categories of discretionary detainees together under a blanket rule. Cf. Transactive Corp. v. United States, 91 F.3d 232, 237 (D.C. Cir. 1996) ("[A]n agency action is arbitrary when the agency offered insufficient reasons for treating similar situations differently."). Since it did not, the agency's adoption of the rule was arbitrary or capricious.

Second, in adopting the regulation, the INS "offered an explanation for its decision that runs counter to the evidence before the agency." State Farm, 463 U.S. at 43. An agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Id. (citation and internal quotation marks omitted). The INS explained that it shifted the presumption in Adeniji because of the INS's reliance on an Inspector General report that "show[ed] that when [noncitizens] are released from custody, nearly 90 percent abscond and are not removed from the United States." 62 Fed. Reg at 10,323. The report says nothing of the kind. See OIG Report; see also Holper, The Beast of Burden in Immigration Bond Hearings, 67 Case W. Res. L. Rev. 75, 90-91 n.56 (2016). Rather, the Inspector General reported that the "INS was successful in deporting only about 11 percent of nondetained noncitizens after final orders [of removal]

had been issued." OIG Report (emphasis added). That distinction is crucial, as noncitizens who are subject to a final order of removal pose a materially different flight risk than those who are still contesting their removability. Compare OIG Report, with U.S. Gov't Accountability Off., GAO-15-26, Alternatives to Detention: Improved Data Collection and Analyses Needed to Better Assess Program Effectiveness 30-31, 31 n.62 (2014), https://www.gao.gov/assets/gao-15-26.pdf (showing at final removal hearings 77% appearance rate for all non-detained noncitizens and 95% appearance rate for noncitizens subject to enhanced monitoring); see also Maj. Op. 36 (discussing lack of Congressional findings about dangerousness or flight risk of noncriminal noncitizens). Indeed, the government recognizes that distinction: it evaluates detention differently before and after a final order of removal has been entered. Compare 8 C.F.R. § 236.1, Adeniji, 22 I. & N. Dec. at 1113, and Matter of Guerra, 24 I. & N. Dec. 37, 40 (B.I.A. 2006), with 8 C.F.R. §§ 241.3-5 and ICE, Performance Based Detention Standards, 2.2 Custody Classification System, (rev. Dec. 2016) https://www.ice.gov/doclib/detention-standards/2011/2-2.pdf. But despite that obvious difference, the INS relied only on data about absconding after entry of a final order of removal. In fact, the inspector general's report was not at all about noncitizens

detained pending hearings. Rather, it was about noncitizens ordered removed who disappeared before they could be removed. The data does not support the INS's decision because it was irrelevant to a decision about noncitizens contesting removal. And nothing else in the record justifies the agency's decision.

Given the agency's reference to irrelevant statistics alone to support the rule, I find its "reasoning to be inscrutable at best and, given the information available to the agency, facially irrational." Marasco & Nesselbush, LLP v. Collins, No. 20-1397, 2021 WL 3012705, at *14 (1st Cir. July 16, 2021).

The INS acted arbitrarily and capriciously when it adopted 8 C.F.R. § 236.1(c)(8). As adopting the regulation was contrary to law, the BIA cannot rely on it to justify its departure from Patel.

## C.

The government offers three arguments for why the BIA's departure from Patel was not arbitrary or capricious. None are persuasive.

The government first argues that Jennings v. Rodriguez, 138 S. Ct. 830 (2016), forecloses any attempt to require the government to bear the burden of proof in § 1226(a) bond proceedings. Jennings held that nothing in § 1226(a) requires "periodic bond hearings every six months in which the Attorney

- 76 -

General must prove by clear and convincing evidence that the [noncitizen]'s continued detention is necessary." Id. at 847. But nor does anything in the statute prohibit the government from requiring itself to justify detention. The statute creates a range of possible action, but it does not remove the agency's obligation to provide a reasoned justification for a change in policy.

The government next argues that "the [BIA's] holding in [Adeniji] represents a reasonable interpretation of Section 1226(a) and is entitled to deference under Chevron principles." But the BIA did not interpret § 1226(a) to reach its decision in Adeniji. It expressly recognized that the statute did not allocate the burden of proof, and then rested its decision on 8 C.F.R. § 236.1(c)(8). Adeniji, 22 I. & N. Dec. at 1113. Chevron does not apply when an agency's decision does not rest on its interpretation of a statute. The government is not entitled to deference. See also supra n.17.

Finally, the government argues that Adeniji does not actually depart from prior decisions because it already had the authority to determine whether and how to release noncitizens on bond. Authority to act is necessary but not sufficient for an agency to change course. See Fox Television, 556 U.S. at 515. Even when an agency has broad authority, it must justify a change

in how it exercises that authority.  See New England Power Generators Ass'n, Inc. v. FERC, 881 F.3d 202, 210 (D.C. Cir. 2018).

## D.

Because the BIA's allocation of the burden of proof rests on arbitrary or capricious foundations, enforcing it against noncitizens in discretionary bond proceedings is unlawful.  5 U.S.C. § 706(2)(A).  The plaintiffs are entitled to a declaration of that unlawfulness.  See Grace v. Barr, 965 F.3d 883, 907-09 (D.C. Cir. 2020).  Beyond such a declaration, the scope of any injunctive relief should be left to the district court in the first instance.  Thus, I would vacate the injunction and judgment and remand to the district court for further briefing on scope of the remedy including as to whether, in light of our holding, the agency should reinstitute proceedings.

## IV.

I turn next to the majority's constitutional holding.

## A.

"[P]rior to reaching any constitutional questions, federal courts must consider nonconstitutional grounds for decision."  Buchanan v. Maine, 469 F.3d 158, 172 (1st Cir. 2006) (quoting Gulf Oil Co. v. Bernard, 452 U.S. 89, 99 (1981)) (quotation marks omitted).  As we can resolve this case on APA grounds, the majority's constitutional analysis is "unnecessary

and, indeed, inappropriate." Marasco & Nesselbush, 2021 WL 3012705, at *19.

On top of general principles of judicial restraint and constitutional avoidance, three considerations specifically support avoiding a constitutional ruling here.

The effect of the majority's opinion is to arrogate to the judiciary control over immigration bond procedures. In most areas of law, we should be cautious in constitutionalizing agency procedures. But in immigration, where Congressional powers are at their apex and judicial powers are at their nadir, see, e.g., U.S. Const. Art. I § 8, c. 18, Trump v. Hawaii, 138 S. Ct. 2392, 2418–19 (2018), even more caution is warranted. There is, to be sure, a role for courts to police constitutionally deficient immigration procedures. See, e.g., Reno v. Flores, 507 U.S. 292, 306 (1993). But we must also remember that "[p]olicies pertaining to the entry of noncitizens and their right to remain here are peculiarly concerned with the political conduct of government." Galvan v. Press, 347 U.S. 522, 531 (1954). That must be so because "the power to expel or exclude [noncitizens] [is] a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." Fiallo v. Bell, 430 U.S. 787, 792 (1977) (quoting Shaughnessy v. Mezei, 345 U.S. 206, 210 (1953)). In rushing to constitutional judgment in a field

the Constitution primarily commits to the political branches, the majority ignores these serious separation-of-powers concerns.

Deciding this case on constitutional due process grounds, as the majority does, is premature and particularly ill-advised given the subject matter. See Clinton v. Jones, 520 U.S. 681, 690 & n.11 (1997). "One of the major advantages of [judicial] minimalism is that it grants a certain latitude to other branches of government by allowing the democratic process room to adapt to future developments, to produce mutually advantageous compromises, and to add new information and perspectives to legal problems." Cass R. Sunstein, Foreword: Leaving Things Undecided, 110 Harv. L. Rev. 4, 19 (1996). In facially holding that a noncitizen may never bear the burden of proof in an immigration bond hearing, see infra Part IV.B, the majority shuns the benefits of further democratic development. Cf. Hightower v. City of Boston, 693 F.3d 61, 76-78 (1st Cir. 2012) (disfavoring facial challenges).

Further, since this litigation began, a new presidential administration has taken office and has begun to change immigration policy. See, e.g., Memorandum from David Pekose, Acting Sec'y, Dep't Homeland Sec., Review of and Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities (Jan. 20, 2021) (announcing 100-day moratorium on most removal proceedings),

https://www.dhs.gov/sites/default/files/publications/21_0120_enf

orcement-memo_signed.pdf; Final Inadmissibility on Public Charge

Grounds; Implementation of Vacatur, 86 Fed. Reg. 14221 (Mar. 15,

2021) (rescinding public charge rule).  If we sent these burden of

proof issues back to the BIA and required the agency to consider

a wider range of circumstances, the agency may well produce a more

nuanced set of bond standards.  In short, we have the chance to

maximize politically accountable deliberation and policy making;

instead, the majority has chosen to make policy from the bench.

Finally, the majority's overreach will have serious

practical consequences.  Our immigration system is taxed to its

limits.[19]  By shifting both the burden of production and persuasion

---

[19] At the end of FY 2020, more than 1,250,000 immigration cases were pending, a 379% increase over the course of the decade. See Dep't of Justice, Exec. Office for Immigration Review, Adjudication Statistics: Pending Cases, New Cases, and Total Completions (April 19, 2021), https://www.justice.gov/eoir/page/file/1242166/download.  That was true even though IJs in recent years have disposed of cases at historic volume.  Dep't of Justice, Exec. Office for Immigration Review, New Cases and Total Completions - Historical (April 19, 2021), https://www.justice.gov/eoir/page/file/1139176/download. The number of bond proceedings has skyrocketed as well.  See Dep't of Justice, Exec. Office for Immigration Review, Statistics Yearbook FY2018 at 9 (showing 49.3% increase in bond over five years).  As apprehensions of undocumented persons at the southern border hit record highs, the burden on the immigration system is only likely to increase. See Dep't Homeland Sec., Customs & Border Protection, Southwest Land Border Encounters (last accessed Aug. 13, 2021) (revealing that encounters at the southern border in the first nine months of FY2021 already exceed highest level for past five full years), https://www.cbp.gov/newsroom/stats/southwest-

and by raising the required quantum of proof to detain a noncitizen in removal proceedings, the majority imposes additional strains on overburdened immigration courts and officials.[20]  In my view, the majority should have avoided unleashing those serious harms on our immigration infrastructure.

The majority contends that constitutional avoidance is unavailable to us in this case because deciding the APA claim in favor of Hernández-Lara would afford her only partial relief.  That contention fails because equitable relief "must be 'no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.'"  Sindi v. El-Moslimany, 896 F.3d 1, 31 (1st Cir. 2018) (quoting Madsen v. Women's Health Ctr., Inc., 512 U.S. 753 (1994)).  If the government has acted unlawfully under the APA, she is entitled only to the necessarily relief as to that

land-border-encounters; N. Miroff, July Was Busiest Month for Illegal Border Crossings in 21 Years, CBP Data Shows, Wash. Post (Aug. 12, 2021), https://www.washingtonpost.com/national/record-numbers-illegal-border-crossings/2021/08/12/e3d305e2-facd-11eb-b8dd-0e376fba55f2_story.html.

[20] The majority "doubt[s] very much that shifting the burden will cause the government to expend more than minimal additional resources obtaining . . . records [from state and local authorities]." Maj. Op. 27.  Nothing in the record supports that claim, and the government disputes it.  Moreover, the government's superior knowledge about the practical implications of reallocating burdens in immigration bond proceedings reenforces my conclusion that the political branches should decide such questions in the first instance.

injury. She is not entitled to the majority's adoption of the broad rule she proposes. This is a basic tenant of remedial law. If Hernández-Lara is entitled to any relief, that relief must be limited only to relief not more burdensome than necessary. In going beyond that relief, the majority again overreaches.[21]

This case demands judicial restraint. The majority opts instead for judicial hubris.

**B.**

Though the majority should not have reached the constitutional question, it did. I will briefly state why I think the majority's due process analysis is contrary to Supreme Court precedent, contrary to precedent from other circuits, and wrong. I do not take the occasion to expound on my views at great length.

The majority derives from the Due Process Clause a categorical rule. It holds that in <u>all</u> discretionary immigration bond cases the government must bear the burden of proving dangerousness by clear and convincing evidence and flight risk by the preponderance of the evidence. The Due Process Clause does not support that broad conclusion.

---

[21] Additionally, the BIA should be given the first opportunity to address the quantum of proof issue, which was not raised in <u>Adeniji</u>. The posture taken in defense of this litigation does not reflect the considered decision making the APA requires.

"In the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens." Demore v. Kim, 538 U.S. 510, 521 (2003) (quoting Mathews v. Diaz, 426 U.S. 67, 79-80 (1976)) (quotation marks omitted). Congress and the Executive have that broad authority because "any policy toward [noncitizens] is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government." Id. at 522 (quoting Diaz, 426 U.S. at 81 n.17). Thus, the Supreme Court has permitted the government to detain noncitizens on a categorical basis, while requiring individualized determinations to detain citizens. Compare Demore, 538 U.S. at 531 (holding that mandatory detention of noncitizens convicted of a wide variety of offenses does not violate the Due Process Clause) and Carlson v. Landon, 342 U.S. 524, 544 (1952) (holding that mandatory detention of Communist noncitizens in removal proceedings does not violate the Due Process Clause), with Salerno, 481 U.S. at 750-51 (permitting detention of criminal defendants charged with a "serious crime" upon a showing that the defendant "presents an identified and articulable threat to an individual or the community"). If categorical detention of noncitizens without individualized review is permissible under the Due Process Clause,

it follows that detention of noncitizens under the government's current regime -- which allows noncitizens to present individualized evidence and rebut the presumption of detention -- does not offend the Due Process Clause either.

The majority also errs in rejecting the current bail detention scheme facially. A facial challenge to detention procedures fails if the procedures are "adequate to authorize the . . . detention of at least some [persons]." Salerno, 481 U.S. at 751 (quoting Schall v. Martin, 467 U.S. 253, 274 (1984) (alteration in original)). And the current bond procedures provide robust enough bond procedures to provide many noncitizens constitutionally sufficient notice and opportunity to be heard.

Even under Mathews v. Eldridge balancing the government may require at least some noncitizens to prove that they are neither dangerous nor flight risks.[22] 424 U.S. 319, 335 (1976) (looking to "the private interest that will be affected by the official action," "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards," and "the Government's interest, including the function involved and the

_____

[22] In upholding the mandatory detention statute for noncitizens convicted of certain crimes (8 U.S.C. § 1226(c)) against a due process challenge, the Supreme Court did not apply Mathews. See Demore, 538 U.S. at 521-31. Thus, it is not clear that Mathews even governs in this context.

fiscal and administrative burdens that the additional or substitute procedural requirement would entail" to determine "the specific dictates of due process").

First, while in general the private interest a person has in avoiding detention is strong, a noncitizen's interest is considerably more limited. "Detention during removal proceedings is a constitutionally permissible part of that process." Demore, 538 U.S. at 531. The detainee's liberty interest is diminished by the fact that he could voluntarily remove himself from the United States at any time.[23] Cf. DHS v. Thuraissigiam, 140 S. Ct. 1959, 1970 (2020) (holding that expedited removal proceedings did not violate the Suspension Clause because asylum seeker could obtain his liberty by consenting to removal). Thus, his real concern is the ability to remain in the United States without being detained.[24]

Second, the majority's adding to and altering of the already robust procedures would do little to improve the accuracy of bond determinations. Under current procedures, noncitizens may

---

[23] The majority suggests that its rule will decrease the length of detentions. Maj. Op. 19. The majority's reasoning must be that shifting the burden to the government will prove to be too onerous to detain most noncitizens. This in turn will inevitably result in more noncitizens returning to their communities, despite the fact that they are dangerous to those communities or flight risks.

[24] The majority's concern with where Hernández-Lara was detained -- "alongside criminal inmates at the Strafford County Jail," Maj. Op. 16 -- is irrelevant to our inquiry here.

introduce evidence to show that they will likely appear at their removal proceedings and are entitled to administrative and judicial review of any adverse bond determination. Indeed, the government is ill-positioned to have information beyond the criminal record.

Third, the government has a strong interest in effectively executing immigration law. "Further, it must weigh heavily in the balance that control over matters of immigration is a sovereign prerogative, largely within the control of the executive and the legislature." Landon v. Plasencia, 459 U.S. 21, 34 (1982).

The current procedures provide detained noncitizens constitutionally sufficient notice and opportunity to be heard. Consider a noncitizen who is removable because he fled from a law enforcement checkpoint in a car. See 8 U.S.C. § 1227(a)(2)(A)(iv); 18 U.S.C. § 758. That criminal record would not subject the noncitizen to mandatory detention. See 8 U.S.C. § 1226(c). But it would provide powerful evidence of his flight risk. Nothing in the majority opinion explains why proceedings would be more accurate under its broad rule, much less why any marginal accuracy would outweigh the government's strong interests.

"It may be, of course, that in some circumstances detention of [a noncitizen] would not pass constitutional muster.

But the validity of those detentions must be determined on a case-by-case basis." Schall, 467 U.S. at 273. The majority's overreaching conflicts with controlling Supreme Court precedents.

Although the majority admits that it fashions its analysis "broadly," it contends that "judicial and administrative efficiency" justifies its holding. Maj. Op. 59. Like so many other problems of constitutional law, however, the level of generality at which we describe the problem is crucial to determining its outcome. See, e.g., Michael H. v. Gerald D., 491 U.S. 110, 127 n.6 (1989). We need not determine the level of due process required in every case through case-by-case adjudication; however, where courts can meaningfully distinguish between relevant categories, courts should not set standards at a greater level of generality. Compare Addington v. Texas, 441 U.S. 418, 431-33 (1979) (setting across-the-board standard for civil commitments on the basis of mental health given the inherent "uncertainties of psychiatric diagnosis"), with Hamdi v. Rumsfeld, 542 U.S. 507, 533-34 (2004) (allowing rebuttable presumption of detention for class of battlefield detainees given the limitations on the government's ability to collect and present evidence of dangerousness). Here, there are meaningful distinctions between categories of noncitizens. To give several examples, the government knows far more about -- and thus faces fewer

administrative burdens in proving the dangerousness or flight risk of -- veterans of the armed forces than noncitizens who have never been lawfully admitted.  It also knows far more about permanent residents than those who overstay nonimmigrant visas.  And, as the government has powerfully argued, it knows little about those who have recently entered the country illegally and been detained.  The government's relative knowledge matters because it directly affects two of the key procedural due process considerations: risk of erroneous deprivation and governmental burden.  The majority's analysis collapses those distinctions.  In so doing, the majority both fails to actually apply the Mathews framework it purports to apply and reaches an overly broad holding.

## c.

"[T]his issue is one where careful judicial consideration should not end with a three-judge panel, or even an en banc sitting of a circuit court of appeals, but with the Supreme Court of the United States."  Allapattah Servs., Inc. v. Exxon Corp., 362 F.3d 739, 741 (11th Cir. 2004) (Tjoflat, J., dissenting from denial of petition for rehearing en banc).

The majority's constitutional holding, as I have explained, "decide[s] an important federal question in a way that conflicts with relevant decisions of [the Supreme] Court."  Sup. Ct. R. 10(c).  The Supreme Court should step in to bring our court

back into compliance with the Supreme Court's carefully considered precedents. Such an intervention would not be mere error correction: given the majority's facial holding, its error is not case specific. It will reverberate in thousands of immigration bond proceedings.

Additionally, the majority's decision conflicts with those of our sister circuits on a question of national importance. See Borbot v. Warden Hudson Cty. Corr. Facility, 906 F.3d 274 (3d Cir. 2018) (holding that initial bond hearing in which noncitizen carried the burden of proof satisfied due process, even when noncitizen had been detained for over 14 months).

In Borbot, the Third Circuit held that the Due Process Clause does not require the government to bear the burden of proof in bond proceedings. 906 F.3d at 279. The majority argues that "the issue presented here was not before the court in Borbot." Maj. Op. 31. Not so. Borbot directly presented the question of whether the government must bear the burden of proof. The Third Circuit expressly ruled on that point of law, and it could not have justified its decision without that ruling. Had the Borbot court not rejected the petitioner's burden-of-proof argument, it could not have denied him a new hearing under different procedures. 906 F.3d at 277. Borbot's discussion of the burden of proof thus meets the textbook definition of a holding. See Garner, et al.,

The Law of Judicial Precedent 46 (2016). And the majority's holding squarely conflicts with it.

The majority also points to a subsequent Third Circuit decision, German Santos v. Warden Pike County Correctional Facility, 965 F.3d 203 (3d Cir. 2020), which it says "casts doubt" on the argument that Borbot accepted the § 1226(a) procedures as adequate. Maj. Op. 32. To the contrary, German Santos proves that the majority has adopted an outlier view. German Santos is a § 1226(c) mandatory detention case. It holds that a noncitizen subject to mandatory detention is entitled to "a bond hearing, at which the [g]overnment must justify his continued detention by clear and convincing evidence" once "his detention has become unreasonable." 965 F.3d at 206 (emphasis added). In holding that the burden of proof should eventually shift to the government once its interest in continued detention attenuates, German Santos and similar cases, see, e.g., Velasco Lopez v. Decker, 978 F.3d 842, 855 (2d Cir. 2020), accept that the burden may lie at first with the noncitizen. The majority's holding -- that the burden must always lie with the government -- conflicts with those cases.

Further review of the majority's holding is warranted to resolve this circuit split and to bring the First Circuit back into compliance with controlling precedent.

- 91 -

## V.

I would vacate the injunction and judgment and remand to the district court for further proceedings consistent with this opinion.  I respectfully dissent.